# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 7, 2012            Decided July 13, 2012

No. 11-5194

KARL HAMPTON,
APPELLANT

v.

TOM VILSACK, SECRETARY,
UNITED STATES DEPARTMENT OF AGRICULTURE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-02221)

———

*Michael J. Kator* argued the cause for the appellant. *Andrea Goplerud* entered an appearance.

*Jane M. Lyons*, Assistant United States Attorney, argued the cause for the appellee. *Ronald C. Machen, Jr.*, United States Attorney, and *R. Craig Lawrence*, Assistant United States Attorney, were on brief. *Christian A. Natiello*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Karl Hampton (Hampton) appeals the district court's grant of summary judgment to Tom Vilsack (Secretary), Secretary of the United States Department of Agriculture (Department, USDA), on a race discrimination claim he brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. *See Hampton v. Vilsack*, 760 F. Supp. 2d 38 (D.D.C. 2011). For the reasons set forth below, we affirm the district court.

**I.**

Hampton is a black male who began working in the Department's Foreign Agricultural Service (FAS) in 1987.[1] Hampton is no stranger to litigation against the Department. He joined a class action against USDA in 1991 and filed an Equal Employment Opportunity complaint against USDA in 1996. Both cases related to racially discriminatory employment practices and both settled. From March 2002 to June 2002, Hampton was detailed to the Executive Office of the President. In April 2002, Dale Miller (Miller), Hampton's first-line supervisor at FAS, used a racial epithet in describing Hampton's detail to another FAS employee.

Hampton had been the subject of two USDA investigations before the investigation at issue here. In April 2002, a USDA employee informed Miller that he had discovered sexually explicit materials in the printer tray of a USDA printer. The USDA Human Resources Division and Computer Security Office conducted an investigation and determined that the materials were printed from Hampton's computer. Acting on a Department employee relations specialist's recommendation, Miller proposed a fourteen-day

---

[1] For the facts, we rely on the undisputed facts set out in the district court's decision and other documents filed in that court.

suspension. Hampton contested the suspension. Ellen Terpstra, a USDA administrator and the deciding official, ultimately sustained two of the three charges against Hampton and reduced his suspension to seven days. Later, in June 2003, FAS's human resources department initiated another investigation involving Hampton, this one alleging that Hampton had a conflict of interest resulting from a food processing company he incorporated in 1998. The investigation—still ongoing in 2004—revealed that Hampton had failed to disclose his financial interest in the company to USDA as required by its ethics regulations.

In early 2004, Hampton submitted for reimbursement a copy of a hotel receipt. USDA employee Christine Lipscomb processed the reimbursement request and, per USDA procedure, asked Hampton to submit the original receipt. Hampton submitted what he said was the original but Lipscomb noticed what she believed were handwritten changes on the receipt. Lipscomb then contacted the hotel to obtain the original receipt. Based on her review of the receipt provided by the hotel and the receipt Hampton submitted, Lipscomb concluded that Hampton had altered the receipt. She then brought the matter to Miller's attention who in turn showed the receipts to Roy Henwood (Henwood), Miller's supervisor and Hampton's second-line supervisor.[2] Henwood believed that the matter should be referred to the Department's Compliance Review Staff (CRS)—Miller agreed and turned over the receipts to Richard Maxwell, a CRS security officer with twenty-five years' experience as an Army criminal investigator.

---

[2] As Hampton's second-line supervisor, Henwood was the deciding official for any disciplinary sanctions taken against Hampton.

In his Report of Investigation (Report), Maxwell concluded, *inter alia*, that Hampton had submitted for reimbursement nine falsified receipts from hotels at which he stayed during six different business trips. The receipts totaled over $1,400, and were altered—some by pen and others typed in a format inconsistent with each hotel's bona fide receipts—to indicate that Hampton had spent additional nights, thereby increasing the reimbursement amount. The Report was based on eighteen witness interviews, copies of records from Hampton's government-issued credit card, hotel receipts and travel vouchers that Hampton submitted. The results of the investigation relating to Hampton's hotel receipts as well as the earlier conflict of interest investigation were sent to Lucy Muir, a USDA employee relations specialist who had had no earlier contact with Hampton. Muir believed Hampton should be terminated. She discussed the matter with Miller who was the proposing official for any sanction imposed on Hampton. After reviewing the Department's table of penalties, Miller likewise determined that termination was the appropriate sanction. Muir drafted and Miller signed a proposal that Hampton be terminated.

Hampton responded to his proposed termination in writing and at a pre-termination hearing before both Muir and Henwood in March 2005. Shortly after the hearing, Henwood asked Maxwell to investigate further several "reasonable questions" that Hampton raised regarding some of the charges against him. Letter from Roy Henwood to Richard Maxwell and Robert Huttenlocker (May 3, 2005) (Maxwell Letter). Specifically, Henwood asked Maxwell to obtain the original receipts from the hotels or, alternatively, to supplement the record with confirmation from each hotel manager that each receipt had been altered or was otherwise fraudulent. Interviews with managers and employees of the hotels for which Hampton submitted receipts revealed that the receipts were not valid. The interviews also revealed that Hampton

threatened legal action against at least one hotel manager if he cooperated with CRS investigators.

On April 25, 2006, Henwood recommended Hampton's termination, sustaining four of the six charges set forth in Miller's termination proposal: Hampton (1) submitted false receipts for reimbursement; (2) failed to properly remit to USDA a credit issued by a hotel to his government-issued credit card; (3) failed to report all required financial interests; and (4) provided false information to CRS as part of an official investigation.[3] Henwood's recommendation was then forwarded to the Foreign Service Grievance Board (FSGB).[4] After a hearing, the FSGB determined that the Department had established cause for Hampton's termination. On May 1,

---

[3]   Henwood did not sustain the charges that Hampton misused a government-issued credit card and used his government position for personal gain.

[4]   With limited exceptions not relevant here, 22 U.S.C. § 4010(a) provides that

> whenever the Secretary decides . . . to separate, on the basis of misconduct, any member of the [foreign] service . . . who . . . is serving under a career appointment . . . , the member may not be separated from the Service until the member receives a hearing before the Foreign Service Grievance Board and the Board decides that cause for separation has been established, unless the member waives . . . the right to such a hearing."

22 U.S.C. § 4010(a)(2)(A); *see also* 3 F.A.M. § 4365(a) ("A separation-for-cause hearing before the Foreign Service Grievance Board will be held . . . for those employees who are entitled to and do not waive such a hearing.").

2007, Henwood formally terminated Hampton's employment.[5]

Hampton filed a formal complaint of discrimination with the Department on June 11, 2007. He then filed suit in the district court on December 6, 2007, alleging various claims under Title VII. On January 13, 2011, the district court granted the Department summary judgment on nine of Hampton's ten counts, including his race discrimination claim.[6] As the district court explained in its order denying Hampton's motion for reconsideration, Hampton "failed [to] raise a material dispute of fact as to whether USDA's proffered reason for terminating [Hampton] (namely, that [Hampton] was found to have submitted falsified reimbursement requests) was pretextual." *Hampton v. Vilsack*, 791 F. Supp. 2d 163, 167 (D.D.C. 2011). The district court concluded that despite the evidence of Miller's racial slur, Miller's involvement in Hampton's termination was " 'too remote, purely contingent, or indirect' to constitute the proximate cause of the harm to [Hampton]." *Id*. at 168. (quoting *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011)).

Hampton timely appealed the district court's grant of summary judgment and denial of reconsideration thereof. Hampton's appeal "concerns only his allegation that race was a motivating factor in his termination." Appellant's Br. 3.

---

[5] The FSGB did not issue its final decision until June 2007.

[6] The district court denied summary judgment on Hampton's claim that the Department retaliated against him by denying him a foreign assignment. Hampton and the Department eventually stipulated to a dismissal with prejudice on that claim.

**II.**

We review a grant of summary judgment de novo. *Bush v. District of Columbia*, 595 F.3d 384, 387 (D.C. Cir. 2010). Summary judgment is appropriate only when "there is no genuine issue as to any material fact." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if the evidence, " 'viewed in a light most favorable to the non-moving party,' " could support a reasonable jury's verdict for the non-moving party. *Id.* (quoting *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)).

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1). To establish an "unlawful employment practice," it is sufficient that "race [or] color . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (to make out Title VII claim, "plaintiff need only present sufficient evidence for a reasonable jury to conclude . . . that race [or] color . . . was a motivating factor for any employment practice" (quotation marks omitted)). Where, as here, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the district court

> must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer

> intentionally discriminated against the employee on the basis of race [or] color?

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

In answering this question, sufficient evidence may include, *inter alia*, " '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).' " *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). Significantly here, "evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence." *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998).

Hampton's primary argument is that, because FAS policy prevented Henwood from imposing a sanction more severe than the sanction Miller proposed, Miller's alleged racial animus was a motivating factor in Henwood's decision to terminate Hampton. While Miller's proposed sanction created a ceiling on the sanction that Henwood could impose, it did not create a floor. *See* 3 F.A.M. 4367(a) (if termination is proposed, deciding official "may decide to . . . [w]ithdraw the charges," or "[a]dmonish," "[r]eprimand," "[s]uspend" or terminate the employee).[7] That is, Henwood was free to

---

[7] If the proposed sanction were either a reprimand or a suspension, it would also act as a ceiling—but not a floor—on the sanction the deciding official can impose. *See* 3. F.A.M. § 4345(a) (if reprimand is proposed, deciding official "will decide to . . . [w]ithdraw the charges," or "[a]dmonish" or "[r]eprimand the

depart downward from Miller's proposed sanction if he decided, based on his independent review of the evidence, that termination was unwarranted. Henwood concluded, however, that termination was warranted given "the nature and seriousness of the . . . [c]harges . . . and their relation to the duties and responsibilities of [Hampton's] position." Letter from Roy Henwood to Karl Hampton at 5 (Apr. 25, 2006). As Henwood noted, Hampton's position entails "work[ing] with little or no supervision and [having] extensive contact with the public" and "[t]herefore[] a great deal of trust is placed on [Hampton] and utmost integrity is expected." *Id.* Because Hampton's conduct made "the agency [] los[e] all faith and confidence that [Hampton] could be trusted to perform ethically or with good judgment," Henwood concluded that termination was "a reasonable response to the sustained charges, and that [Hampton's] removal will promote the agency's efficiency of service." *Id.*

Moreover, nothing in the record suggests that Henwood's "stated reason [for terminating Hampton] was not the actual reason and that the [Department] intentionally discriminated against [Hampton] based on his race."[8] *Brady*, 520 F.3d at

employee"); *id*. § 4355(a) (if suspension is proposed, deciding official "will decide to . . . [w]ithdraw the charges" or "[a]dmonish," "[r]eprimand" or "[s]uspend the employee for a specified period of time not to exceed the period proposed").

[8] Although Hampton attempts to challenge before us the factual basis of the four charges that led to Henwood's decision, *see* Reply Br. 15-19, his challenge is misplaced. In a Title VII action, "[t]he question [before us] is not whether the underlying . . . incident[s] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incidents[s] occurred." *Brady*, 520 F.3d at 496 (emphasis in original). It is undisputed that Henwood believed the underlying misconduct occurred. The FSGB's determination that the Department established "by a

495. Assuming, as we must, that Miller's April 2002 remark manifested some racial animus toward Hampton, Hampton introduced no evidence that Miller's animus infected Henwood's recommendation or decision, made four and five years later, respectively. To begin with, Miller was in no way involved in the investigation of Hampton's alleged misconduct. Although he formally initiated the investigation, he did so only after Lipscomb discovered the suspicious hotel receipt submitted by Hampton and after Henwood expressed his belief that CRS should investigate the matter. Miller Dep. at 176-79. Lipscomb had had no dealings with Hampton before the events in this case, Hampton Dep. at 249; nor is there any evidence that Miller did anything but follow proper procedure in reporting Hampton's misconduct to CRS, Miller Dep. at 178-79. After turning over the documents to Maxwell, he took no part in the investigation or in the preparation of the Report.

---

preponderance of evidence" that "[Hampton] commit[ed] the acts he is charged with" amply supports Henwood's belief, Decision at 3, FSGB, No. 2006-012 (June 6, 2007), and Hampton has offered no evidence "sufficient to show that [Henwood's] conclusion was dishonest or unreasonable," *Brady*, 520 F.3d at 496.

If Hampton sought to attack the factual basis of the FSGB's decision, he should have sought judicial review of that decision pursuant to 22 U.S.C. § 4140(a). *See* 22 U.S.C. § 4140(a) ("Any aggrieved party may obtain judicial review of a final action of . . . the Board on any grievance in the district courts of the United States in accordance with the [judicial review] standards set forth in [the Administrative Procedure Act], if the request for judicial review is filed not later than 180 days after the final action of . . . the Board . . . ."); *see also United States v. Paddack*, 825 F.2d 504, 508 n.5 (D.C. Cir. 1987) ("Any party aggrieved by a Board decision may obtain judicial review of that decision in the United States District Court, which reviews the Board's decision under the provisions of 5 U.S.C. § 706 []." (citation omitted)).

Furthermore, the evidence is clear that Henwood—the deciding official—did not merely rely on Miller's proposed sanction in deciding to terminate Hampton. Henwood conducted an independent review of the evidence. He provided Hampton an opportunity to respond in writing and orally to the proposed termination and he even ordered an additional investigation after Hampton raised several "reasonable questions" about the charges made against him at the March 2005 hearing. Maxwell Letter. Ultimately, Henwood withdrew two of the charges that Miller had proposed against Hampton: one for lack of evidence and the other based on evidence Hampton submitted.

In sum, this is not a case in which the deciding official was "dependen[t] upon [a biased subordinate's] opinion" or was "[unable] independently to assess" the basis for sanctioning an employee. *Griffin*, 142 F.3d at 1311. On the contrary, Henwood "made an independent assessment of [Hampton's] conduct and concluded that [Hampton's] violations of multiple [USDA] employment policies warranted his termination." *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1080 (D.C. Cir. 1999). There is no evidence that Henwood "was in any way influenced by [Miller]" in reaching his decision to terminate Hampton. *Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007); *see also Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant."); *cf. Staub*, 131 S. Ct. at 1193 ("[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable."). Given Henwood's authority to reduce Miller's proposed sanction and the absence of any evidence suggesting that Henwood's

termination decision was pretextual or that Henwood "[was] not insulated from [Miller's] influence," *Griffin*, 142 F.3d at 1312, we believe that Hampton failed to produce sufficient evidence for a reasonable jury to conclude that he was terminated because of racial discrimination.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Secretary.

*So ordered.*