# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 27, 2014　　　Decided December 16, 2014

No. 13-5038

KEVIN HAIRSTON,
APPELLANT

v.

DAVITA VANCE-COOKS, ACTING PUBLIC PRINTER,
UNITED STATES GOVERNMENT PRINTING OFFICE,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01531)

---

*Brian Wolfman* argued the cause for the appellant. *Anne King* was with him on brief.

*Javier M. Guzman*, Assistant United States Attorney, argued the cause for the appellee. *Ronald C. Machen, Jr.*, United States Attorney, *John G. Interrante* and *R. Craig Lawrence*, Assistant United States Attorneys were with him on brief.

Before: HENDERSON, *Circuit Judge*, and GINSBURG and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 2006, Kevin Hairston applied for a promotion within the Government Printing Office (GPO). His application was ultimately rejected and Hairston believes his rejection was based on racial discrimination. He also believes that he was the victim of unlawful retaliation in 2009 when the GPO sent a group of employees, *sans* Hairston, to a training program in Georgia. Based on these events, Hairston sued the GPO under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for unlawful discrimination and retaliation. The district court granted summary judgment to the GPO on all counts. We affirm.

## I.  Background[1]

The GPO is generally responsible for printing official documents of the federal government. *See* 44 U.S.C. § 501. The documents include passports, which the GPO prints on a six-color Heidelberg press. As its description suggests, the Heidelberg press has six ink-fountain units that require the constant supervision of employees who have been specially trained. Operating the press also requires GPO employees to manage special dyes, invisible inks and embedded electronic chips to protect the security of passport production. The GPO assigns each Heidelberg press a four-person team consisting

---

[1] Background facts are taken from: (1) Jeffrey Bernazzoli's EEO Affidavit, Joint Appendix (JA) 105–08; (2) Earl Hayward's EEO Affidavit, JA 109–13; (3) Douglas Davis's EEO Affidavit, JA 283–86; (4) Nelson Batty's Declaration, JA 313–15; (5) Kevin Hairston's Declaration, JA 360–425; (6) Charles Dais's Declaration, JA 426–30; (7) Carter Daniel's EEO Affidavit, JA 512–13; (8) Kevin Hairston's Deposition, JA 517–86; (9) Jeffrey Bernazzoli's Deposition, JA 587–607; (10) Earl Hayward's Deposition, JA 608–33; and (11) Martin Verter's Deposition, JA 634–54.

of a Head Pressperson, a Second Offset Pressperson, a Printing Plant Worker and a Feeder.

In 2006, the demand for passports rose and the GPO issued a Vacancy Announcement (VA) seeking applicants for the Second Offset Pressperson position. Only permanent GPO employees could apply at the time. The VA stated that an applicant should be able to do "the work of a Second Offset Pressperson with normal supervision," including "the independent operation of offset press machinery as well as the ability to perform troubleshooting, maintenance and adjustments." JA 67 (emphasis omitted). Hairston, a black male, applied for the position and the GPO Office of Personnel determined that he met the minimum qualifications listed in the VA. A GPO foreman, Earl Hayward, then reviewed a list of the qualified applicants to decide whom to recommend. Only Hairston's name was listed because the other applicants did not qualify. Hayward ultimately recommended Hairston and Superintendent George Domarsky approved the selection. Hairston's application was rejected, however, by Jeffrey Bernazzoli, the Production Manager in the Press Division of the GPO. Although Hairston met the minimal qualifications set out in the VA, Bernazzoli explained that the Second Offset Pressperson "was not a training position; therefore, we needed someone who could step in right away." JA 105–06. "[I]t was clear" to Bernazzoli that Hairston did not have the necessary experience and that it "would have been detrimental to Mr. Hairston to put him in this position because he would not have been able to do it." JA 105. Bernazzoli likened promoting Hairston to sending him "up the creek without a paddle." *Id.*

According to Bernazzoli, he rejected Hairston's application based on discussions with his GPO colleagues.

4

One person he spoke to was Domarsky, who told Bernazzoli that Hairston could not immediately run a six-color Heidelberg press. Bernazzoli also stated that Martin Verter, his Assistant Production Manager, agreed with Domarsky's assessment. Bernazzoli relied heavily on Verter's opinion because Verter was his "eyes and ears on the [production] floor." JA 604. Verter, however, did not recall talking with Bernazzoli about Hairston but he emphasized that he was "not saying that it didn't happen." JA 649. Verter also stated that he was unaware of the position that Hairston applied for because that position "[w]asn't my concern." JA 646.

Other GPO employees believed Hairston to be inexperienced. Hayward said that Hairston was far from the "seasoned veteran" the GPO was hoping to hire as Second Offset Pressperson. JA 111. Hayward also stated that it would take approximately six to eight months to train Hairston to be a fully operational Second Offset Pressperson. Charles Dais, a former GPO Head Offset Pressperson-in-Charge, likewise stated that "it probably takes the average pressperson who is promoted from within [the GPO] to Second Offset Pressperson about six months to feel comfortable enough" to run a six-color press. JA 429. And Nelson Batty, a GPO multicolor pressperson, agreed that it would take "a minimum of at least six months of daily training to train a single color pressperson [like Hairston] to be proficient" on a six-color Heidelberg press. JA 314.

Hairston then attempted to file a complaint with the GPO Equal Employment Opportunity (EEO) office alleging that he was not promoted to Second Offset Pressperson based on racial discrimination. The EEO office told Hairston that it could not process his complaint until the GPO "actually b[r]ought in a White employee" for the position listed in the VA. JA 540.

With Hairston's application rejected, the GPO relisted the VA with the same requirements and enlarged the applicant pool to include those who did not work in the GPO. The new notice was posted on October 13, 2006, and ran for three weeks. Hairston applied again under the relisted VA and his name was included on a final list of seven applicants who then had in-person interviews with a panel of GPO supervisors. During his interview, Hairston answered numerous questions incorrectly and received the lowest overall score among the seven candidates. The GPO ultimately hired Douglas Davis, a white male who had ten years of experience working on multicolor presses and who received the highest interview score. Davis began working at the GPO approximately five months after the relisted VA was posted. Upon learning of Davis's hire, Hairston then filed his EEO complaint. Subsequently, the GPO issued another VA for a Second Offset Pressperson but Hairston did not apply. One of the individuals hired under this VA was black.

Months after the GPO filled the relisted VA, Hairston temporarily performed a limited number of the functions of a Second Offset Pressperson. Hairston claims that he quickly learned how to run the six-color press and that he was able to operate it by himself. Hairston received good reviews during his temporary stint and he was nominated for a time-off award due to his high level of performance. Hayward, however, said that Hairston performed only "a condensed part of the job" while temporarily filling in as a Second Offset Pressperson. JA 629.

Hairston further alleged that he was retaliated against for filing his EEO complaint. Because his other retaliation claims were dismissed for failure to exhaust administrative remedies, Hairston's only allegation of retaliatory action is that he was

excluded from a GPO training program held in Kennesaw, Georgia. Davis—who was hired for the relisted VA position—was in charge of coordinating attendance for the program. Davis in turn directed Carter Daniel, a GPO Head Web Pressperson and union representative, to survey presspersons and gauge their interest in attending. According to Daniel, Hairston expressed no interest in attending the training session and Davis ended up sending eight other employees, including four black employees, to the Georgia training program. Davis claimed that he did not know of Hairston's EEO activity when he selected the eight attendees.

Hairston disputes that he was asked whether he wanted to attend the training program, claiming that "[t]here is always more to learn on presses, and I like to take advantage of the training opportunities I am offered." JA 390. Yet when asked if he would have wanted to attend the Georgia training program, Hairston indicated he would not because he "wanted to concentrate [his] training on things that [he] hadn't learned at all." JA 566–67.

Hairston brought suit against the GPO in district court on September 3, 2008. He included three counts in his amended complaint: (1) Bernazzoli's failure to promote him was based on racial discrimination; (2) the GPO's failure to include him in the Georgia training program was motivated by racial animus; and (3) the GPO unlawfully retaliated against him by excluding him from the Georgia training program. The GPO moved for summary judgment on all three counts. The district court held that Hairston had not presented evidence from which a reasonable jury could reject the GPO's nondiscriminatory reason for not promoting him. It also held that failing to send Hairston to the Georgia program was not an adverse employment action and thus could not trigger an unlawful retaliation claim. In the alternative, the court held

that Hairston had not presented any evidence to rebut the GPO's evidence that the program attendees were chosen according to a *bona fide* understanding of who was interested. *See Hairston v. Boardman*, 915 F. Supp. 2d 155, 162 (D.D.C. 2013). Accordingly, the district court granted summary judgment to the GPO on all counts. Hairston timely appealed. Our jurisdiction is based on 28 U.S.C. § 1291.

## II. Analysis

"We review a grant of summary judgment de novo." *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012). Summary judgment will be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists "if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the non-moving party." *Hampton*, 685 F.3d at 1099 (internal quotation marks omitted).

Hairston no longer argues that the GPO's failure to send him to the Georgia training program evinced racial discrimination. His remaining claims, then, involve the GPO's alleged discrimination in not promoting him to Second Offset Pressperson and the GPO's alleged retaliation in excluding him from the Georgia training program.

## A. Failure to Promote

If a Title VII plaintiff does not proffer direct evidence of discrimination, "we apply the analytical framework adopted by the Supreme Court in *McDonnell Douglas*." *Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008)

(internal citation omitted). The Supreme Court has divided that framework into three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (internal citation and quotation marks omitted). We need not, however, address the first two steps. The GPO contends that it did not promote Hairston to Second Offset Pressperson because of his inexperience, rather than his race. Once an employer asserts a legitimate, nondiscriminatory reason for its conduct in a Title VII lawsuit, we "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, we proceed directly to the heart of the matter: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?" *Id.*

Ordinarily, if a plaintiff identifies evidence "from which a jury could find that the employer's stated reasons were pretextual, [that] will be enough to get [his] claim to a jury." *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (internal alterations omitted). Showing pretext, however, requires more than simply criticizing the employer's decisionmaking process. Even if a plaintiff "was victimized by poor selection procedures," we may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal alteration omitted). Hairston presses four arguments to demonstrate the GPO's proffered reason was pretextual. We are not persuaded.

*First*, Hairston argues that conflicting testimony regarding Bernazzoli's conversation with Verter suggests the conversation was fabricated after the fact. When asked at his deposition if he remembered discussing Hairston's application with Bernazzoli, Verter said "[n]o, I don't recall. I am not saying that it didn't happen. I don't recall it." JA 649. When then asked whether he meant the conversation did not happen, Verter said "[i]t is possible [that it happened], yes. We talked about a number of things . . . . I just don't remember this specific one." *Id*. But Verter's failure to recall the conversation is not inconsistent with Bernazzoli's statement that the conversation occurred. Indeed, we have found that one party's failure to recall a conversation does not, on its own, create a genuine issue of material fact. *See Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 30 (D.C. Cir. 1997) ("[a] deponent's inability to recall specifics three years later

does not rebut" defendant's legitimate, nondiscriminatory reasons for employment action).[2]

Hairston also draws an adverse inference from the fact that, while Bernazzoli mentioned conversations with Verter and Domarsky in his deposition, he did not do so in his EEO affidavit. Providing more detailed information once litigation begins does not create a genuine issue of material fact. "To suggest otherwise is essentially to direct employers to publish a contemporaneous statement of reasons every time they make a hiring or firing decision—a requirement that Title VII has never been understood to impose." *Jackson v. Gonzales*, 496 F.3d 703, 710 (D.C. Cir. 2007); *see also Crockett v. Abraham*, 284 F.3d 131, 134 (D.C. Cir. 2002) (later statement that "does not contradict . . . deposition but rather augments and elaborates upon it" does not create genuine issue of material fact).

*Second*, Hairston argues that "it is implausible that Mr. Bernazzoli actually believed" that he, Hairston, "was unqualified." Appellant Br. 31. More specifically, Hairston contends that Bernazzoli should not have asked Verter for his

---

[2] In his reply brief, Hairston argues that Verter's "hedging" was the product of coaxing from GPO's counsel at a recess during the deposition. Before the recess, Verter stated that "to [his] knowledge" and "to [his] recollection," he first learned of Hairston's application when he was notified of his deposition. JA 648. To Hairston, this testimony suggested that Verter did not discuss Hairston's application with Bernazzoli. After the recess, Verter confirmed that he "d[idn't] recall" the conversation but emphasized that he was "not saying that it didn't happen." JA 649. In his pre-recess testimony, however, Verter did not categorically state that he never spoke with Bernazzoli; he qualified his statements by tying them to his knowledge and recollection. Verter's post-recess statements followed the same path: namely, he could not recall the conversation with Bernazzoli.

opinion of Hairston's application and that, instead, Bernazzoli should have consulted Hairston's direct supervisors. This argument suggests that, because there were better ways to determine if Hairston was qualified, Bernazzoli must not have been seeking that information at all. As we have previously noted, however, the key question in this context "is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183 (internal quotation mark and alterations omitted). Hairston proffers nothing that calls into question the genuineness of Bernazzoli's belief that Hairston was not qualified for the job he was seeking. Bernazzoli stated that Verter was his "eyes and ears on the floor" and Verter had in fact supervised Hairston during his GPO apprenticeship. JA 604, 641–43. Indeed, Verter affirmed in his deposition that he had known Hairston "as long as he has been in the pressroom." JA 641. Bernazzoli also testified another supervisor shared Verter's concerns. He remembers Domarsky, who was directly involved in the selection decision, opining that Hairston "didn't have the knowledge nor the experience to run" the Heidelberg six-color press immediately so as to meet the increased demand for passports. JA 599.

Hairston also argues that his temporary stint as Second Offset Pressperson demonstrates that he was, in fact, qualified for the job. But "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Based on the consistent testimony of Verter, Domarsky, Hayward, Dais and Batty, Hairston needed at least six months of training to become a Second Offset Pressperson. Hairston's failure to identify even a single GPO employee who believed Hairston's training would have taken fewer than six months undercuts his argument that Bernazzoli

could not have genuinely believed that Hairston was inexperienced.

*Third*, Hairston argues that the GPO's need to quickly fill the relisted VA to meet the increased demand for passports was pretextual because it took the GPO approximately five months to hire Davis. But Hairston does not question the fact that the GPO faced an increased demand for passports. The question, then, is whether Bernazzoli honestly believed, at the time he rejected Hairston's application, that he could find an experienced pressperson in less time than it would take to fully train Hairston and with less strain on the Press Division. *See Brady*, 520 F.3d at 495 ("employer prevails if it 'honestly believes in the reasons it offers' ") (quoting *Fischbach*, 86 F.3d at 1183). Every GPO supervisor who was surveyed estimated that it would have taken at least six months for Hairston to become a fully operational Second Offset Pressperson. Each estimate also allowed for the fact that the necessary training could take *more* than six months. Hairston relies on his temporary stint as Second Offset Pressperson as evidence that he was a quick learner. But this *post hoc* experience does not suggest that Bernazzoli had reason to believe Hairston's training could go quickly *at the time* he reviewed Hairston's application. *See Leavitt*, 407 F.3d at 415 ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").

At bottom, Hairston disagrees with the GPO's gauging the likelihood that his training would take longer than the time it would have taken to hire an experienced candidate and we do not reweigh an employer's balancing of factors it considered. *Jackson*, 496 F.3d at 709 ("[G]iven the dynamic nature of the hiring process . . . we will not second-guess how

an employer weighs particular factors in the hiring decision.").

*Fourth*, Hairston argues that two allegedly patronizing comments Bernazzoli made and an alleged history of discrimination in the GPO are evidence of pretext. Bernazzoli stated that promoting Hairston would be akin to "throwing, you know, an infant in there," JA 602, and also suggested that Hairston would be "up the creek without a paddle" if he were promoted to Second Offset Pressperson, JA 105. These statements, however, are neither explicitly racial nor infused with racial undertones based on common usage. We do not infer discriminatory intent if the words uttered are plainly lacking in racial animus. *Cf. Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 764–66 (D.C. Cir. 2002) (comments calling Asian woman "China doll" and "Little Gook" sufficient to infer racial animus).

Moreover, Hairston's claim that there is a history of discrimination at the GPO is unconvincing. He relies on discrimination complaints filed in the past to establish institutional discrimination but we have rejected similar arguments before. *See, e.g.*, *Holcomb*, 433 F.3d at 899–900 ("We are not persuaded that the mere filing of two informal discrimination complaints . . . where nothing more is known about the nature, merit, or outcome of those complaints, can be used as a proxy to establish [the defendant's] discriminatory animus in the present case."). Additionally, Hairston's argument that there are too few black employees in GPO management positions misses the mark. We have held that "[i]n *individual* disparate treatment cases, however, statistical evidence is less significant because the ultimate issue is whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision." *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984).

In sum, Hairston has not raised a genuine issue of material fact regarding whether the GPO's legitimate, nondiscriminatory reason for not promoting him was pretextual.

## B. Unlawful Retaliation

"Under Title VII, it is unlawful for an employer to [retaliate] against any of its employees because she has made a charge or participated in any manner in an investigation of discrimination." *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (internal quotation marks and alterations omitted). A *prima facie* showing of retaliation requires that "(1) [the plaintiff] engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012).

In district court, the parties disputed whether the GPO's failure to send Hairston to the Georgia training program was an adverse employment action. We do not resolve that question. Assuming *arguendo* that Hairston's exclusion from the training program was sufficiently adverse, he nonetheless does not survive summary judgment because he offered no evidence that the GPO's proffered reason for denying him training—that the decisionmaker thought he did not want it—was pretextual. Although Hairston raises questions about the reliability of Daniel's survey results, he offers no reason Davis would have doubted them at the time. Moreover, Davis had no reason to retaliate. *See Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("To prove unlawful retaliation," the plaintiff must "show that [the supervisor], who made the promotion selection, had knowledge of her protected activity."). Davis stated that he "had no knowledge of any

prior EEO complaints filed by Mr. Hairston" when he was organizing the Georgia training program. JA 285. Hairston identifies no contrary evidence.[3] On this record, then, there is no basis to conclude that Hairston's EEO complaint was the reason for his exclusion from the training event. *See Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.").

For the foregoing reasons, the district court's judgment is affirmed.

*So ordered.*

---

[3] Hairston argues that the GPO's knowledge of his EEO complaint should be imputed to Davis because Davis was GPO's agent. Our holding in *Talavera* forecloses that argument. *See Talavera*, 638 F.3d at 313 ("[plaintiff] had to show that [her supervisor], *who made the promotion selection*, had knowledge of her protected activity" to establish unlawful retaliation claim) (emphasis added).