# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 16, 2019          Decided June 14, 2019

No. 18-7059

KEMIT MAWAKANA,
APPELLANT

v.

BOARD OF TRUSTEES OF THE
UNIVERSITY OF THE DISTRICT OF COLUMBIA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-02069)

Richard A. Salzman argued the cause and filed the briefs for the appellant.

Jason R. Waters argued the cause for the appellee. Yoora Pak, Elisabeth L. Shu and Robert B. Wallace were with him on brief.

Before: HENDERSON, ROGERS and PILLARD, Circuit Judges.

Opinion for the Court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Law professor Kemit Mawakana was denied tenure and terminated by his employer, the University of the District of Columbia. He sued the University's Board of Trustees, claiming the University discriminated against him based on race and violated both the terms and spirit of its contract with him. The district court granted the University's motion for summary judgment as to each count of Mawakana's complaint. Mawakana appealed as to three counts. We now reverse as to those counts.

## I.   BACKGROUND

In 2006, Mawakana,[1] a black male, was hired by the University of the District of Columbia ("University") to serve as a law professor at the David A. Clarke School of Law ("Law School"). Pursuant to his initial employment contract, Mawakana was hired as an Assistant Professor for a three-year period. In 2009, Mawakana's employment contract was renewed and in 2010 he was promoted to Associate Professor. In July 2011, Mawakana applied for tenure. There is no record evidence that Mawakana heard anything about his tenure application during the 2011-2012 academic year. In early fall 2012, he was invited to and attended a meeting of the faculty subcommittee assigned to review his application. At the meeting the subcommittee assured him that his application was in good shape. A short time later, however, Mawakana attended another subcommittee meeting at which the subcommittee informed him that it had some concerns about his scholarship. In November 2012, Mawakana was invited to and attended a meeting with Law School Dean Katherine "Shelley" Broderick (Broderick), and faculty subcommittee chairman, John Brittain. At the meeting they both suggested that he withdraw

---

[1] Mawakana was known as Samuel Jefferson before changing his name in 2010.

his tenure application. Mawakana refused. In February 2013, the subcommittee issued its assessment of Mawakana's tenure application, concluding that his scholarship was not worthy of tenure and recommending that tenure be denied. The full faculty evaluation and tenure committee reviewed and adopted the subcommittee's report. Broderick then reviewed and endorsed the recommendation of the full faculty evaluation and tenure committee. University Provost Ken Bain subsequently reviewed and adopted the recommendation of the full faculty evaluation and tenure committee and Broderick. Finally, University President James Earl Lyons upheld the recommendation of Provost Bain. On May 1, 2013, Mawakana received notice that he had been denied tenure and that his employment was to terminate effective August 15, 2013.

Believing he was denied tenure because of his race and that the University had violated a contractual obligation to timely notify him of concerns regarding his scholarship, Mawakana sued the University Board of Trustees in the Superior Court for the District of Columbia in October 2014. [2] He alleged statutory race-based discrimination claims and contract claims.[3] In March 2017, after removing the case to federal

---

[2] A race discrimination claim against the University brought by another black law professor who had been denied tenure was pending before this Court at the time. *See Brown v. Sessoms*, 774 F.3d 1016 (D.C. Cir. 2014). We ultimately reversed the district court's dismissal of that professor's claim, *id.* at 1025, after which the parties reached a settlement agreement and the professor was reinstated.

[3] Count I of the complaint alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.1–2-1404.04. Count II alleged race discrimination in violation of 42 U.S.C. §§ 1981 and 1983. Count III alleged breach of contract. Count IV alleged breach of an implied covenant of good faith and fair dealing.

4

district court and moving unsuccessfully to dismiss, the University then moved for summary judgment. In March 2018, the district court granted the motion and entered judgment for the University. *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 315 F. Supp. 3d 189, 194 (D.D.C. 2018). The district court first held that the University was entitled to summary judgment on Mawakana's Title VII and D.C. Human Rights Act (DCHRA) claims because, especially considering "the heightened deference accorded to academic decisions," *id.* at 199 (capitalization altered), no reasonable jury could find that Mawakana "was denied tenure because of his race," *id.* at 207–08. The district court next held that the University was entitled to summary judgment on Mawakana's 42 U.S.C. §§ 1981 and 1983 claims. *Id.* at 208–09. The district court also held that Mawakana's contract claims were untimely. *Id.* at 209–10, 212. Finally, it held that even if Mawakana's contract claims were timely and the University had breached a contractual duty, the claims failed because the breach had not caused Mawakana damages. *Id.* at 210–11. Mawakana timely appealed all but the district court's grant of summary judgment on the section 1981 and section 1983 claims. We review the district court's decision *de novo*, *Allina Health Servs. v. Price*, 863 F.3d 937, 940–41 (D.C. Cir. 2017), mindful that summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

## II. ANALYSIS

### A. STATUTORY CLAIMS

Both Title VII and the DCHRA make it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race. 42 U.S.C.

§ 2000e-2(a)(1); *accord* D.C. Code § 2-1402.11(a)(1). An employee who has suffered an adverse employment action because of his race has been subjected to a violation of both statutes. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802–03 (D.C. 2003) (clarifying Title VII and DCHRA are subject to same analysis).

### 1. "Academic Deference"

When the Congress passed Title VII in 1964, educational institutions were exempt "with respect to the employment of individuals to perform work connected with the educational activities of such institution[s]." Pub. L. No. 88-352, § 702, 78 Stat. 253, 255. Eight years later, however, in "response to the widespread and compelling problem of invidious discrimination in educational institutions," *Univ. of Pa. v. EEOC* (*Penn*), 493 U.S. 182, 190 (1990), the Congress amended Title VII and eliminated that exemption. Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 3, 86 Stat. 103, 103–04. The Congress was not persuaded by opponents of the amendment who "claimed that enforcement of Title VII would weaken institutions of higher education by interfering with decisions to hire and promote faculty members." *Penn*, 493 U.S. at 190. Ever since the Congress "abandoned [Title VII's] exemption for educational institutions" in 1972, their academic hiring has been subject to Title VII's restrictions. *Id.*

Thirteen years after the 1972 amendment, the United States Supreme Court held in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985), that deference to academia is appropriate in certain circumstances. In *Ewing*, a student sued a university for dismissing him from school without permitting him to retake a failed exam. *Id.* at 217. The

student argued that he had a substantive right under the Due Process Clause to continued enrollment at the university free from arbitrary state action. *Id.* Relying on the First Amendment principle of "academic freedom" and the fact that the university had "acted in good faith," the Court declined to override the university's judgment that dismissal was proper. *Id.* at 225–26. "When judges are asked to review the *substance of a genuinely academic decision*, such as this one," the Court said, "they should show great respect for the faculty's professional judgment." *Id.* at 225 (emphasis added). Granting the university deference, the Court held that the decision to dismiss the student was not "arbitrary." *Id.* at 223.

Five years later, in *Penn*, the Supreme Court suggested that, notwithstanding *Ewing*, the normal Title VII standard applies to universities. In *Penn*, the United States Equal Employment Opportunity Commission sued a university to enforce a subpoena after the university declined to release confidential materials related to the tenure review process of a faculty member who had sued the university under Title VII. 493 U.S. at 185–87. The Court first held that the effect of the 1972 amendment to Title VII, discussed above, "was to expose tenure determinations to the same enforcement procedures applicable to other employment decisions." *Id.* at 190. It then rejected the university's attempt to invoke academic freedom as a legitimate ground for refusal to comply with Title VII's requirements. *Id.* at 198 (full enforcement of Title VII does not infringe academic freedom because it does not "prevent[] the [u]niversity from using any criteria it may wish to use, except those—including race, sex, and national origin—that are proscribed under Title VII"). As a result, the Court ordered the university to release the materials. *Id.* at 201–02. Importantly (if unsurprisingly), the Court did not overlook *Ewing*. Instead, the Court held that its decision should not "be understood as a retreat from th[e] principle of respect for *legitimate* academic

decisionmaking" set forth in *Ewing*. *Id.* at 199 (emphasis in original).

Consistent with *Penn*'s suggestion, we believe that *Ewing* and the concept of academic freedom do not entitle a university to special deference in Title VII tenure cases. Indeed, the first premise of the deference afforded the university in *Ewing* was that the university had "acted in good faith." 474 U.S. at 225. That premise cannot be assumed in a Title VII case, where the question is *whether* the employer acted in good faith. The second premise of the Court's deference in *Ewing* was that the Court was being asked to review "the substance of a genuinely academic decision." *Id.* That premise also cannot be assumed in a Title VII case, where a court is asked to evaluate the reason for—as opposed to the substance of—the University's decision and thus *whether* the employer's decision was "genuinely academic." In sum, *Ewing* dictates that a court cannot second-guess a university's decision to deny tenure *if* that decision was made in good faith (i.e., for genuinely academic reasons, rather than for an impermissible reason such as the candidate's race). But a Title VII claim requires a court to evaluate *whether* a university's decision to deny tenure was made in good faith (i.e., for academic reasons rather than for an impermissible reason such as the applicant's race).

The ordinary Title VII claimant's burden may be "especially difficult to meet when it comes to academic tenure," *Haynes v. Ind. Univ.*, 902 F.3d 724, 734 (7th Cir. 2018), because (1) tenure decisions are informed by specialized, multi-factored judgments and (2) numerous decisionmakers are usually involved in the tenure review process, *see id.* But the burden is no more difficult to meet than in any other Title VII case where the employment decision at issue involves complex judgments and numerous

decisionmakers are involved.[4] In other words, the Title VII burden is no more difficult to meet *because* the employer is a

---

[4] Some cases simply apply the same Title VII standard to faculty members as to other discrimination plaintiffs; others discuss *Ewing* and the concept of academic freedom, expressing solicitude for academic institutions' faculty employment decisions. *Compare Haynes*, 902 F.3d at 734 (not relying on *Ewing* or academic freedom concept), *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73–75 (2d Cir. 2015) (same), *Ragozzine v. Youngstown State Univ.*, 783 F.3d 1077, 1079 (6th Cir. 2015) (same), *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1067–68 (9th Cir. 2002) (same), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) (en banc), *Clinger v. N.M. Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1168 (10th Cir. 2000) (same), *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 255–58 (5th Cir. 1999) (same), *Stewart v. Rutgers*, 120 F.3d 426, 431–34 (3d Cir. 1997) (same), *and Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 345–46 (1st Cir. 1989) (same), *with Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (citing *Ewing* and suggesting that, because of "academic freedom," courts "tread cautiously" in Title VII tenure cases), *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 557 (4th Cir. 2011) (because of *Ewing* and academic freedom concept, "courts may undertake" only "limited review" "in cases involving employment decisions of academic institutions"), *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) (citing *Ewing* and stating "academic setting" distinguishes "denial of tenure" "from employment decisions generally"), *and Villanueva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991) (suggesting "academic freedom" is reason a denial of tenure must be obviously or manifestly unsupported to violate Title VII). On close examination of the latter cases, however, it is unclear whether they in fact apply a different Title VII standard. *See Blasdel*, 687 F.3d at 815 (acknowledging "the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist"); *Adam*s, 640 F.3d at 557 (review of faculty employment decisions is limited "to whether the appointment or promotion was denied because of a discriminatory reason" as in non-tenure Title VII cases (quoting

university. Although the First Amendment grants a university certain freedoms, the freedom to discriminate is not among them.

## 2. "Reasonable Jury" Factors

Having determined that the University is not entitled to special deference in this case, we now assess whether Mawakana can establish a violation of Title VII and the DCHRA using the standard three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (applying *McDonnell Douglas* to Title VII claim); *Futrell*, 816 A.2d at 802–03 (applying *McDonnell Douglas* to DCHRA claim). At the first step of *McDonnell Douglas*, an employee must show a prima facie case of discrimination. *Hairston*, 773 F.3d at 272. If the employee meets this burden, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the

---

*Smith v. Univ. of North Carolina*, 632 F.2d 316, 345–46 (4th Cir. 1980))); *Okruhlik*, 395 F.3d at 879 ("review of [tenure] decisions is limited to whether the tenure decision was based on a prohibited factor" as in non-tenure Title VII cases); *Villanueva*, 930 F.2d at 129 ("Academic freedom does not embrace the freedom to discriminate."). To the extent there is any genuine conflict, for the reasons discussed *supra*, we agree with those courts that do not grant universities special deference in Title VII tenure cases based on *Ewing* and the concept of academic freedom. We acknowledge that, when a court assesses a Title VII discrimination case, it has an obligation to ensure "the dispute is not simply one of academic disagreement with the underlying decision to deny tenure." *Haynes*, 902 F.3d at 734. But this obligation applies in every Title VII case— that is, a Title VII plaintiff must *always* demonstrate not simply a substantive disagreement with the employment decision but that the decision was, at least in part, based on the plaintiff's membership in a protected class.

challenged adverse employment action. *Id.* If the employer meets its burden, the burden shifts back to the employee to show that the reason offered by the employer was not its true reason but was instead a pretext for discrimination. *Id.* If the employer has already proffered a legitimate, nondiscriminatory reason for its adverse employment action, however, the court skips straight to "the ultimate question of discrimination *vel non.*" *George v. Leavitt*, 407 F.3d 405, 411–12 (D.C. Cir. 2005) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)).

In this case the University has proffered a legitimate, nondiscriminatory reason for denying Mawakana tenure. It says he was denied tenure because his scholarship was deficient. Thus, we ask whether, "viewing the evidence in the light most favorable to [Mawakana] and drawing all reasonable inferences accordingly," *e.g.*, *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018) (quoting *Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013)), a reasonable jury could find Mawakana was denied tenure because of his race, *see, e.g.*, *Baloch*, 550 F.3d at 1196 ("[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race . . . ."). Specifically, we ask whether a reasonable jury could find that Mawakana's race was a "motivating factor" in the University's decision to deny him tenure. *See* 42 U.S.C. § 2000e-2(m) (plaintiff can prove liability under Title VII by demonstrating race "was a motivating factor for [the relevant] employment practice, even though other factors also motivated the practice"); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101 (2003) (to make out Title VII claim, "plaintiff need only present sufficient evidence for a reasonable jury to conclude . . . that race . . . was a motivating factor for any employment practice" (internal quotation marks omitted)).

A constellation of factors suggests to us that a reasonable jury viewing the evidence in the light most favorable to Mawakana *could* find that race was a motivating factor in the University's decision to deny him tenure. *First*, there is evidence that the University, and specifically Broderick, treated certain criteria differently when assessing the scholarship of black tenure candidates as opposed to white candidates. According to the Law School's Official Standards and Procedures for Retention and Tenure, the University considers both the number and the quality of a candidate's published scholarly works an important criterion. But the University treated a co-authored work as inferior in assessing the application of a black candidate, Joint Appendix (JA) 1205, even though it did not do so in assessing the application of a white candidate, JA 1235–78. Likewise, Broderick treated work published in the University's own law review as inferior in assessing the application of a black candidate, JA 1229, although the University did not so treat a white candidate's work published in the same law review, JA 826–30. Finally, Broderick dissuaded a black candidate from applying for tenure by telling her that the University would not permit her to rely on legal briefs and memoranda as scholarship, JA 1233–34, notwithstanding the University treated these materials as qualifying scholarship in assessing the application of a white candidate, JA 1235–70.

*Second*, there is evidence that Broderick, who played an outsized role in the tenure review process, *see Mawakana*, 315 F. Supp. 3d at 205 (it is "not disputed" that a reasonable jury could believe "the recommendation of a Dean who had been running the law school for more than 15 years carried substantial weight"), disfavored Mawakana's application. JA 1202. This history is relevant because, although Broderick was not the ultimate decisionmaker, the jury could find that her negative stance on Mawakana's tenure application was a

"proximate cause" of the University's ultimate decision to deny him tenure. *See Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (employer can be held liable in Title VII context if supervisor who is not ultimate decisionmaker performs act, motivated by discriminatory animus and intent to cause adverse employment action, which proximately causes such action (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011))). The evidence in the record, viewed together and *in the light most favorable to Mawakana*, raises a plausible inference that Mawakana's race was a reason Broderick disfavored his application. For instance, Broderick's apparent change of position about the quality of one of Mawakana's articles could be viewed as pretextual. She originally recommended Mawakana for promotion because the article was "of high quality, it reflects originality, creativity, and intellectual inquiry, and it contributes to the growth and understanding of the law," JA 1156, but she later agreed with the faculty committee's concern about Mawakana's scholarship, which resulted in its finding that the same article did not meet tenure standards, JA 397. In her deposition, when asked if the "high quality" standard was the same for promotion and tenure, Broderick answered, "I think so, yes." JA 1010. The record also raises a genuine issue of material fact whether Broderick changed her position on Mawakana's service to the law school, which she found wanting in her recommendation against tenure. *See* JA 397. In his declaration, Mawakana said that Broderick and another professor "specifically asked [him] to take on" the role of Faculty Athletics Representative (FAR), that he was told the role counted toward his service at the law school and that Broderick did not express any reservation about it. JA 1058. In her letter recommending against tenure, however, Broderick said that she and the other professor "strenuously advised [Mawakana] not to accept the time consuming job as FAR in order to concentrate his efforts on his teaching and scholarship." JA 397.

*Third*, the evidence adequately supports an inference that Broderick used her influence in a manner generally more supportive of white than black tenure candidates. Broderick supported every white applicant for tenure during her time as Dean. JA 1004. Once, she lobbied so hard for a white applicant to receive tenure that another faculty member testified that she had "made [tenure] happen" for that applicant. JA 1026. On the other hand, Broderick raised concerns about more than half of the black applicants who applied for, or considered applying for, tenure, JA 1025, 1231; 1029; 1152–53; 1233–34, including Mawakana, JA 382, 1021–22, 1027–28, some before the faculty had even reviewed their applications, JA 1021–22, 1025, 1028. And at least one person involved in the tenure review process seems to have believed race played a part in some of the Dean's decisions whether to support an applicant. Indeed, the chairman of the faculty review committee wrote in an email to another faculty member: "After losing 4 colleagues these past months, all faculty of color, . . . I am not inclined to be pressured by more of [Broderick's] efforts to clean her house." JA 1314.

*Fourth*, two members of the University faculty who were privy to the internal workings of the tenure review process testified that they believed the University had disfavored black professors within that process. JA 1036–38, 1044–45.

*Fifth*, of the eight white applicants who applied for tenure between the time Broderick became the Dean in 1999 and the time Mawakana filed suit in 2014, each one received tenure. JA 1004. By contrast, of the seven black professors who applied for tenure within that time period, only five received tenure. JA 48–49, 1358–59; JA 400, 1206. Those numbers may not be overly alarming until one considers that one of the five was initially denied tenure—a decision which was reversed only after her Title VII race discrimination claim survived a

motion to dismiss, *see Brown*, 774 F.3d at 1018; JA 49—and two other black faculty members were dissuaded from applying in the first place because Broderick told them they had no chance of succeeding, JA 1152–53, 1233–34.

These five factors, taken together and *viewed in the light most favorable to Mawakana*, raise a plausible inference that race was a motivating factor in the University's decision to deny Mawakana tenure. At this stage, we give no opinion regarding whether Mawakana was in fact discriminated against based on his race. We simply cannot state that, as a matter of law, he was *not* discriminated against based on his race.

## B. CONTRACT CLAIMS

Next we assess whether the University is entitled to summary judgment on Mawakana's contract claims. Because the district court held these claims time-barred, we begin by addressing timeliness before moving to the merits.

### 1. Timeliness

"A contract action must be brought within three years of the date on which the 'right to maintain the action accrues.' An action for breach of contract generally accrues at the time of the breach." *Wright v. Howard Univ.*, 60 A.3d 749, 751 (D.C. 2013) (quoting D.C. Code § 12-301). In his complaint, which he filed on October 2, 2014, Mawakana alleged that the University expressly and/or impliedly contracted with him to, *inter alia,* meet with him "at least once each academic year to . . . discuss the degree to which . . . his performance me[t] the standards for promotion and tenure." Mawakana further alleged that, consistent with this requirement, the intent of the parties' contract was that the University was to provide him with notice of any concerns it had regarding his scholarship "with sufficient time for [him] to make adjustments or

corrections or address those concerns before a decision [was] made in the formal tenure review process." Mawakana alleged that the University failed to meet its obligation and should therefore be held liable for breach of contract and breach of the implied covenant of good faith and fair dealing. We believe that Mawakana's contract claims are timely to the extent they allege the University's breach occurred when it failed to meet with him during the 2011-2012 academic year. If a breach occurred as alleged, his claims accrued on the final day of the 2011-2012 academic year—sometime in mid-2012—less than three years before the October 2, 2014 filing date.

## 2. Merits

Thus, we proceed to the merits, where we ask whether a reasonable jury could find that—by failing to meet with him during the 2011-2012 academic year—the University breached either the terms or intent of its contract with Mawakana and thereby caused him damage. Indeed, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). And "all contracts contain an implied duty of good faith and fair dealing . . . . If a party to the contract evades the spirit of the contract . . . he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000). At this stage, Mawakana may yet be able to prevail on one or both of his contract claims.

There remains an unresolved factual dispute whether an implied-in-fact contract between Mawakana and the University existed and, if it did, what the terms and, in turn, the intent of that contract were. In an earlier ruling, the district court rejected

Mawakana's contract claims "insofar as they are based on a theory of express contract," *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 113 F. Supp. 3d 340, 349 (D.D.C. 2015), but found that Mawakana stated "a plausible claim that a combination of [facts] created an implied contract between [him] and the University," *id.* at 356. The district court has not, as yet, resolved whether an implied-in-fact contract existed. In the ruling under review, the district court assumed *arguendo* the existence of an implied-in-fact contract that imposed on the University "a duty to provide feedback and an annual review in academic year 2011-2012," and held that "because plaintiff filed his tenure application *before* the 2011-12 academic year[,] . . . even if defendant breached the contract that year, that breach did not cause the harm of which plaintiff complains." *Mawakana*, 315 F. Supp. 3d at 210–11. Because the court points to no basis in law nor any undisputed fact indicating that Mawakana would not have been able to update his application had he been timely informed of a deficiency, this was error.

If there existed an implied-in-fact contract between Mawakana and the University (a "valid contract"); if either the terms or intent of that contract imposed on the University a duty to meet with Mawakana at least once during the 2011-2012 academic year to discuss whether his performance met the tenure standard (an "obligation or duty"); and if Mawakana would have been permitted to update his tenure application after such meeting, the University's failure to meet with Mawakana during the 2011-2012 academic year (a "breach") arguably contributed to his failure to obtain tenure ("caused" him "damages"). Because factual issues central to Mawakana's contract claims remain disputed, the district court's grant of summary judgment on these claims was premature.

17

For the foregoing reasons, we reverse the challenged portion of the district court's judgment and remand the case for further proceedings consistent with this opinion.

*So ordered.*