Filed 3/16/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| NOUSHIN KHOINY, | B301486 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC575230) |
| v. | |
| DIGNITY HEALTH, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen J. Czuleger, Judge. Reversed.

Makovoz Law Group and Ilana Makovoz for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, Eric C. Schwettmann and John J. Manier for Defendants and Respondents.

## INTRODUCTION

This case presents an issue of first impression under California law: whether a medical resident's claim that she was dismissed from her residency program due to gender discrimination and in retaliation for complaints about discrimination and workplace safety is subject to the rule of academic deference. We hold the predominant relationship between a medical resident and a hospital residency program is an employee-employer relationship, and so academic deference does not apply to the jury's determination whether the resident was terminated for discriminatory or retaliatory reasons. The jury in this case returned a verdict in favor of respondent Dignity Health, doing business as St. Mary Medical Center (SMMC), after being improperly instructed that SMMC's decision to terminate Dr. Noushin Khoiny (appellant) was entitled to academic deference in the first instance. Dr. Khoiny presented credible evidence of gender discrimination and retaliation by SMMC, and there is a reasonable probability that, in the absence of the erroneous jury instruction, she would have obtained a more favorable verdict. We reverse the judgment and remand for a new trial.

## BACKGROUND

From June 24, 2012 to August 11, 2014, Dr. Khoiny was a paid resident in the internal medicine program at SMMC in Long Beach, California. After completing the second year of the three-year program, Dr. Khoiny was dismissed from the program. On March 11, 2015, Dr. Khoiny filed a complaint against SMMC alleging her dismissal was retaliatory and based on gender discrimination. On November 5, 2015, she filed the operative second amended complaint which included causes of action for

gender discrimination, retaliation for reporting gender discrimination, and failure to prevent gender discrimination or retaliation in violation of Fair Employment and Housing Act (Gov. Code, § 12940); whistleblower retaliation in violation of Health and Safety Code section 1278.5; and whistleblower retaliation for reporting unsafe workplace conditions in violation of Labor Code section 6310.  The complaint included other causes of action not at issue in this appeal.

Trial by jury began in 2018.  The trial court declared a mistrial after the jury could not reach a verdict.

The second trial began in 2019.  The court instructed the jury with Special Instruction SI 28 (SI 28) which the trial court described as "dealing with academic deference."  That instruction read:

"Since St. Mary's residency program was academic in nature, St. Mary's academic judgment should not be overturned unless it is found to have been arbitrary and capricious, not based on academic criteria, or motivated by bad faith, or ill will, or motivated by retaliation or discriminatory reasons unrelated to her academic performance.

"You must uphold the decision of St. Mary Medical Center unless you find its decision was a substantial departure from accepted academic norms as to demonstrate that the person or committee did not actually exercise professional judgment."

The court also gave the jury a special verdict form.  The first question, entitled "ACADEMIC DEFERENCE," asked: "Do you find that Dignity Health dba St. Mary Medical Center's termination of Dr. Khoiny's employment was arbitrary and capricious, not based on academic criteria, or motivated by bad faith or ill will, or motivated by retaliation or discriminatory

3

reasons unrelated to academic performance?"  If the jury answered "No," it was directed to skip to the end of the 13-page special verdict form and sign it.  The jury answered, "No."

## DISCUSSION

I.    The Trial Court Erroneously Applied Academic Deference to Appellant's Claims.

We begin by noting the elements of and analysis required in California for claims of gender discrimination and retaliation under the Fair Employment and Housing Act (FEHA).  (Gov. Code, § 12900 et seq.)  To establish a prima facie case of retaliation under FEHA a plaintiff must show they engaged in "protected activity"; the employer subjected the employee to an adverse employment action; and a causal link existed between the protected activity and the employer's action.  (*Yanowitz v. L'Oreal, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)  To establish a prima facie case of discrimination under FEHA, a plaintiff must show they were a member of a protected class; they were qualified for the position or were performing competently in the position they held; they suffered an adverse employment action, such as termination, demotion, or denial of an available job; and some other circumstance suggested discriminatory motive.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).)  Once a plaintiff establishes a prima face case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action.  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation and discrimination "drops out of the picture," and the burden shifts back to the employee to prove intentional retaliation or discrimination.  This is the three-part

4

burden shifting analysis of *McDonnell Douglas Corp v. Green* (1973) 411 U.S. 793, 802–805 employed in Title VII cases and adopted by California for use in FEHA cases. (*Yanowitz,* at p 1042; *Guz,* at pp. 354–356.) This test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained. (*Guz,* at pp. 354.)

In contrast to the burden-shifting analysis adopted for FEHA claims in California is the rule of academic deference, which the First District Court of Appeal summarized 25 years ago: "It is well settled that in actions challenging the academic decision of a private university regarding a student's qualifications for a degree, we exercise a highly deferential and limited standard of review. 'There is a widely accepted rule of judicial nonintervention into the academic affairs of schools.' (*Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803, 808 [159 Cal.Rptr. 858, 602 P.2d 778] (*Paulsen*).) We may only overturn the university's decision if we find it to be arbitrary and capricious, not based upon academic criteria, and the result of irrelevant or discriminatory factors. (*Id.* at pp. 808–809; accord, *Wong v. Regents of University of California* (1971) 15 Cal.App.3d 823, 830 [93 Cal.Rptr. 502].) We must uphold the university's decision 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' (*Regents of University of Michigan v. Ewing* (1985) 474 U.S. 214, 225 [88 L.Ed.2d 523, 532, 106 S.Ct. 507] (*Ewing*).)" (*Banks*

*v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551 (*Banks*).)
It is this doctrine of academic deference which the trial court
erroneously applied to Dr. Khoiny's claims of gender
discrimination and retaliation.

In their briefing the parties have cited five California cases
and one United States Supreme Court case involving academic
deference:  *Banks*, *supra*, 35 Cal.App.4th 1545; *Paulsen*, *supra*,
25 Cal.3d 803; *Wong v. Regents of University of California*, *supra*,
15 Cal.App.3d 823; *Shuffer v. Board of Trustees* (1977)
67 Cal.App.3d 208; *Lachtman v. Regents of University of
California* (2007) 158 Cal.App.4th 187; and *Ewing*, *supra*,
474 U.S. 214.  Plaintiffs in these cases were all students enrolled
in traditional academic institutions: colleges, universities or
graduate schools.  Nothing in these opinions suggests any
student received financial compensation for services rendered in
connection with the academic programs.  No student brought a
FEHA claim, which has as a " 'fundamental foundation for
liability' . . . ' "existence of an employment relationship" ' between
the parties."  (*McCoy v. Pacific Maritime Assn.* (2013)
216 Cal.App.4th 283, 301.)

Several of these cases, and other federal cases as well,
apply the academic deference rule to medical students
participating in clinical rotations, but a medical student is not
similarly situated to a medical resident.  On a very broad level,
medical students are very similar to traditional students:  they
are enrolled in and pay tuition to a university or college for the
purpose of obtaining an academic medical degree while receiving
limited hands-on clinical experience.

On the other hand, medical residents have graduated from
medical school and are being paid ordinary taxable income to

6

provide medical services to a hospital or medical center while also receiving clinical training; much of the service they provide is indistinguishable from that provided by fully licensed physicians. A medical residency program within a hospital or medical center is not a traditional academic institution with predominantly traditional student activities. The Cambridge Dictionary, for example, defines "academic" as "relating to schools, colleges, and universities, or connected with studying and thinking, not with practical skills."[1]

We do not find useful the cases involving medical students. Dr. Khoiny is a medical resident with a medical degree who received compensation for providing patient services on behalf of an institution whose primary purpose is to provide patient care. She asserted claims dependent upon the existence of an employment relationship with the defendant medical center. Some part of the relationship between the two parties involved learning practical skills and some even smaller part involved studying to acquire medical knowledge. We will therefore look outside California for assistance in analyzing whether the academic deference rule applies to medical residents.

A. *Residents Are Predominantly Employees, Not Students.*

A medical residency program involves a mixture of education and employment. The Accreditation Council for Graduate Medical Education (ACGME) accredits, monitors, and

---

[1] Cambridge Dictionary Online (2022) <https://dictionary.cambridge.org/us/dictionary/ english/academic> [as of March 11, 2022], archived at <https://perma.cc/4ZKV-RA9F>.

7

disciplines residency programs.  ACGME requires a minimum of two-thirds of residents' time to be spent in patient care.[2]  There is no minimum requirement for time spent in didactic sessions.  The California Medical Board describes a medical residency as a "post graduate *training* program" (italics added) during which residents engage in "the practice of medicine . . . in connection with their duties as a resident."[3]  The National Labor Relations Board (NLRB) has likened medical residents to apprentices, who are considered employees for collective bargaining purposes. (*Boston Med. Center Corp.* (1999) 330 NLRB 152, 161.)

The trial court justified its decision to treat the residency program as academic by stating that the program was "primarily" academic.  Given that ACGME guidelines require a minimum of 66 percent of a resident's time to be spent in patient care, the court could not rationally have based its conclusion on the amount of time residents actually spent in traditional academic activities (i.e., didactic sessions).  The trial court appears to have relied on the residents' goals in participating in the program to reach its conclusion.  The court said:  "One cannot progress any further in one's career and obtain employment as a board-certified doctor unless one has complied with all of the requirements.  And the requirements set forth in a nationwide standard which requires certain subjects to be taught, graded

---

[2]     Specifically, ACGME requires at least one-third of the time to be spent in an ambulatory patient setting and at least one-third to be spent in an inpatient setting.

[3]     Medical Board of California Web site (2022) <https://www.mbc.ca.gov/Licensing/Postgraduate-Training-Licensees> [as of March 11, 2022], archived at <https://perma.cc/77NE-XCNN>.

and the student must progress." This was, at best, an incomplete assessment. An equally important question asks what were the goals of the residency program itself.

Generally, medical residents have been found to spend 75 percent to 80 percent of their time providing services to the medical centers or hospitals where their residency programs are located. (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 619 (*PERB*); *Boston Med. Center Corp., supra,* 330 NLRB at p. 160.) Significantly, "the patient care services performed by housestaff [are] an important part of the hospital's overall service delivery." (*PERB*, at p. 618 [housestaff refers to interns, medical residents and fellows].)[4] The United States Supreme Court has rejected an argument that residents are not fully trained and have yet to begin their working lives, finding instead that these doctors " 'who work long hours, serve as highly skilled professionals, and typically share some or all of the terms of employment of career employees' " are in fact workers, even if they are also "students of their craft." (*Mayo Found. for Med. Educ. & Research v. United States* (2011) 562 U.S. 44, 60 (*Mayo*).)

We find useful the test applied for collective bargaining purposes, specifically the test formerly used to determine whether "student employees whose employment is contingent on their status as students" are employees. (Gov. Code, § 3562,

---

[4]     As the evidence in this case shows, there is a national body, ACGME, which sets standards for and accredits medical residency programs. Thus, while the programs before the court in *PERB* were those related to the University of California system, the basic structure of all residency programs should be similar.

subd. (e).) This test has been applied to medical residents. As the California Supreme Court explained in upholding a decision by the Public Employees Relations Board (Board) that medical residents are employees, the Board considers not only the medical residents' own goals "but also the services they actually perform, to see if the students' educational objectives, however personally important, are nonetheless subordinate to the services they are required to perform. Thus, even if [the Board] finds that the students' motivation for accepting employment was primarily educational, the inquiry does not end here. [The Board] must look further— to the services actually performed— to determine whether the students' educational objectives take a back seat to their service obligations."[5] (*PERB*, *supra*, 41 Cal.3d at p. 614.)

Essentially, this test asks whether the program views and treats its residents as primarily students or primarily employees, an important consideration in evaluating whether a program's decision concerning a resident is an academic one. The Board found that "although housestaff did receive educational benefits in the course of their programs, this aspect was subordinate to the services they performed." (*PERB*, *supra*, 41 Cal.3d at p. 618.) The Board found evidence that in the UC system, "[h]ousestaff also work very long hours. An 80- or 100-hour week is not uncommon. More than 75 percent of that time is usually spent in

---

[5] Under Government Code section 3562, former subdivision (e), "[t]he board may find student employees whose employment is contingent on their status as students are employees only if the services they provide are unrelated to their educational objectives, *or, that those educational objectives are subordinate to the services they perform* and that coverage under this chapter would further the purposes of this chapter." (Italics added.)

10

direct patient care. [¶] The remaining time is spent in didactic, or instructional, activities." (*Id*. at p. 619.) The Court upheld the Board's ruling that medical residents are employees.

At the time the California Supreme Court decided *PERB*, the NLRB still treated medical residents as students, not employees, for purposes of collective bargaining under federal law. Our Supreme Court expressly disagreed with the reasoning of the NLRB. (*PERB, supra*, 41 Cal.3d at pp. 612–613.) Ten years later, the NLRB repudiated its earlier decisions, and reached the same conclusion about housestaff, including medical residents, as our Supreme Court did. (*Boston Med. Center Corp.*, *supra*, 330 NLRB 152, 159–164.)

The NLRB, too, recognized that medical residents spend a large part of their time rendering services: "Most noteworthy is the undisputed fact that house staff spend up to 80 percent of their time at the Hospital engaged in direct patient care. The advanced training in the specialty the individual receives at the Hospital is not inconsistent with 'employee' status. It complements, indeed enhances, the considerable services the Hospital receives from the house staff, and for which house staff are compensated. *That they also obtain educational benefits from their employment does not detract from this fact.*" (*Boston Med. Center Corp.*, *supra*, 330 NLRB at pp.160–161, italics added.) As the Board pointed out: "Members of all professions continue learning throughout their careers[.]" (*Id*. at p. 161.)

The United States Supreme Court has also found it logical to treat medical residents as employees rather than students, based on the sizeable amount of time residents spend rendering services. (*Mayo, supra,* 562 U.S. at pp. 58–60.) While *Mayo* involves a student exemption from FICA taxes, the Court's

11

analysis of the distinction "between workers who study and students who work" is useful. The Court rejected two arguments: 1) that "[b]ecause residents' employment is itself educational, . . . the hours a resident spends working make him " 'more of a student, not less of one' "; and 2) that by focusing on the number of hours worked, the Treasury Department had "drawn an arbitrary distinction between 'hands-on training' and 'classroom instruction.' " (*Id.* at pp. 58–59.) The Supreme Court pointed out that the Treasury Department had "reasoned that '[e]mployees who are working enough hours to be considered full-time employees . . . have filled the conventional measure of available time with work, and not study.' [Citation.] The Department thus did not distinguish classroom education from clinical training but rather education from service." (*Id.* at p. 59.)

All the cases discussed above involve residency programs not before this court. Nevertheless, they have general application to our analysis of respondent's programs, because all residency programs are expected to follow ACGME guidelines. While it is not determinative of our analysis, we note that the specific residency program at SMMC was not in compliance with ACGME's guidelines concerning the academic aspects of its program. ACGME placed SMMC's residency program on probation as of January 2014 for problems dating back to 2012. The ACGME investigation was occurring during Dr. Khoiny's residency at SMMC. ACGME found that respondent "did not demonstrate that its core curriculum includes a didactic program based upon the core knowledge content of internal medicine." ACGME also found respondent had failed to demonstrate compliance with the "scholarly activities" component of a residency program, and that it "does not appear that the faculty

12

have adequately established and maintained an environment of inquiry and scholarship for the residents." SMMC's probationary status was based on its violation of two requirements: the requirement that residents evaluate the program annually, and the requirement that the program evaluate residents by providing "objective assessments of competence in patient care, medical knowledge, practice based learning and improvement, interpersonal and communication skills, professionalism and system based practice." SMMC also assigned residents to more time in the intensive care unit (ICU) than permitted and recommended by ACGME. The evidence in this case showed that the ICU rotation was the most time-intensive of the rotations. Thus, if anything, SMMC's residency program before and during Dr. Khoiny's tenure was less academic and more service oriented than an average residency program.

In sum, SMMC is not primarily an academic institution and treating its residency program as "primarily" an academic program does not match the realities of medical residency programs. They are employment programs with an educational component.

     B.    *The Record Does Not Support Respondent's Position that Dr. Khoiny Was Terminated for Academic Reasons.*

Respondent's position that Dr. Khoiny was terminated for academic reasons and therefore academic deference should apply to her dismissal is not supported by the record. In fact, there is no clear explanation in the record of how or why respondent's decision to terminate Dr. Khoiny was an "academic" one. Both in the trial court and on appeal, respondent refers to Dr. Khoiny's performance as marginal or deficient, but evidence of

performance deficiencies involved almost exclusively patient care, that is, her provision of services to patients, or "deficiencies" in her personality, such as a lack of assertiveness. This is not what is traditionally meant by "academic" performance. Perhaps this lack of clarity stems from respondent's lack of objective assessment methods for residents in the area of medical knowledge, a clearly academic area, which ACGME found was a long-standing unresolved problem in the program.

At the same time, it is clear respondent *did* assess Dr. Khoiny on the services she rendered. Patient care indisputably played a very significant role in respondent's discussion of and decision to terminate Dr. Khoiny. Further, in asserting a mixed-motive same decision affirmative defense, respondent claimed that even if gender or retaliation were a motivating factor in Dr. Khoiny's termination, it would have terminated her anyway for "poor job performance." It is not clear why respondent used the work "job performance" in connection with its affirmative defense, while using the phrase "academic performance" and "academic" judgment in SI 28. It is not clear whether respondent believed that poor "job" performance was the same as poor "academic" performance, or if respondent was simply hedging its bets.[6]

---

[6] Respondent appears to have had difficulty deciding exactly why it terminated Dr. Khoiny. As we noted in a previous opinion in this matter, the "gravamen of [respondent's] answer was that [Dr. Khoiny] was discharged for cause because she had provided substandard patient care." (*Khoiny v. Dignity Health* (Apr. 2, 2018, B280304) [nonpub. opn.].) Respondent subsequently refused to comply with the trial court's order to produce certain medical records relevant to Dr. Khoiny's claims. When faced

C.    *This Case Should Be Tried as a Standard FEHA Case.*

Having determined that a medical residency program is not primarily an academic program and that the decision to terminate the employment of a resident cannot be assumed to be academic, we are left with the question of how a jury in this case should be instructed to evaluate respondent's decision to terminate Dr. Khoiny.  Ultimately, we hold that a residency program's claim that it terminated a resident for academic reasons is not entitled to deference.  As we set forth in more detail below, the jury should be instructed to evaluate, without deference, whether the program terminated the resident for a genuine academic reason or because of an impermissible reason such as retaliation or the resident's gender.

Respondent contends the United States Court of Appeals for the Fifth Circuit applied academic deference to medical residencies in *Davis v. Mann* (5th Cir. 1989) 882 F.2d 967

_____

with discovery sanctions, respondent "then asserted a new argument that plaintiff had not been terminated from the program based on 'standard of care' but because other employees said that she was 'unqualified.'  [Respondent's] counsel stated that the real grounds for termination was plaintiff's alleged refusal to accept responsibility for her errors, not any deficiency in treatment, and was 'not based on review of the medical records,' which made the records at issue irrelevant."  This explanation was unconvincing in light of respondent's earlier argument that they were entitled to summary judgment because Dr. Khoiny "had not made a prima facie showing that she was performing competently, which, [it] argued, could *only* be established by medical records."  (*Khoiny v. Dignity Health, supra,* B280304.)

15

(*Davis*).  Respondent states: "The Fifth Circuit has held 'medical residents should be treated as students[.]' "  The opinion does not contain the word "treated," let alone the phrase "medical residents should be treated as students."  The plaintiff in *Davis* was a dental resident who was participating in a program for dentists which, the opinion states "operated like a typical medical residency."  (*Id.* at p. 969 & fn. 1.)

Respondent attempts to equate Dr. Khoiny's employment law claims with those of the dental resident in *Davis*.  The only claim before the Fifth Circuit was a claim that the program's dismissal procedures violated his Fourteenth Amendment rights to procedural due process.  (*Davis*, *supra*, 882 F.2d at pp. 968, 972.)  The Fifth Circuit found only "the minimal protections required for an academic dismissal" applied to this due process claim.  (*Id.* at p. 974.)

The court in *Davis* did state, without citation to authority, that "It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program."  (*Davis*, *supra*, 882 F.2d at p. 974.)  We are unable to evaluate the court's undocumented claim concerning what was well-known about residency programs in 1989, or indeed what the purposes and requirements of a residency program were in Mississippi at that time, or how Mississippi viewed medical or dental residents under Mississippi law.  We can say at that time the NLRB still treated medical residents as students for collective bargaining purposes; perhaps that was the source of the Fifth Circuit's knowledge.  As we have noted, the

16

NLRB subsequently repudiated that position.[7]  And, as we have explained, by 1989 the California Supreme Court had already decided that education was subordinate to the provision of services and medical residents should be treated as employees for collective bargaining purposes.

Respondent also points out that some federal courts have applied academic deference to disability discrimination claims involving academic institutions.  We do not find the analysis in those cases helpful.  While the federal American with Disabilities Act (ADA) and Rehabilitation Act do not permit discrimination based on disability, the Acts require only reasonable accommodations for disabled individuals and expressly do not require a school to substantially modify or lower its standards to accommodate disabled students.  This raises entirely different issues than a claim of employment discrimination based on gender or for retaliatory purposes.  (*Zukle v. Regents of Univ. of Cal.* (9th Cir. 1999) 166 F.3d 1041, 1046-1047 (*Zukle*) [noting a "majority of circuits have extended judicial deference to an educational institution's academic decisions in ADA and Rehabilitation Act cases as the Acts do not require an academic institution "to make fundamental or substantial modifications to its programs or standards" to accommodate disabled students.].)

_____

[7]     "[W]e reach our decision here to overrule *Cedars-Sinai* [*Medical Center* (1976) 223 NLRB 251] and its progeny on the basis of our experience and understanding of developments in labor relations in the intervening years since the Board rendered those decisions.  Almost without exception, every other court, agency, and legal analyst to have grappled with this issue has concluded that interns, residents, and fellows are, in large measure, employees.  [Citations.]" (*Boston Med. Center Corp.*, *supra*, 330 NLRB at p. 163.)

17

One case cited in *Zukle*, but not mentioned by respondent, *Pushkin v. Regents of Univ. of Colo.* (10th Cir. 1981) 658 F.2d 1372, does involve a wheelchair-bound medical resident with multiple sclerosis. (*Id.* at p. 1376.) As the Ninth Circuit noted, but respondent does not, the Tenth Circuit expressly declined to apply academic deference to the claims in *Pushkin*. (*Zukle, supra*, 166 F.3d at p. 1047; see *Pushkin*, at p. 1383.)

We note at least three federal circuit courts of appeals have found medical residents are employees for purposes of Title VII claims. (*Doe v. Mercy Catholic Med. Center* (3rd Cir. 2017) 850 F.3d 545, 559 [medical resident was employee for purposes of Title VII claim]; *Takele v. Mayo Clinic* (8th Cir. 2009) 576 F.3d 834, 838 [treating medical resident as an employee for purposes of Title VII and applying standard *McDonnell Douglas* framework to discrimination claim]; *Maynard v. Bd. of Regents of Universities of Fla.* (11th Cir. 2003) 342 F.3d 1281, 1289 [same].) Title VII cases can be helpful in FEHA cases. "In interpreting California's FEHA, California courts often look for guidance to decisions construing federal antidiscrimination laws, including title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII)." (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984.) While helpful on the issue of whether medical residents are employees, the *Doe*, *Takele* and *Maynard* decisions do not, however, address the issue of academic deference.

D.  *A Title VII Denial of Tenure Case Provides the Best Framework for Deciding FEHA Claims by Medical Residents*

We find most useful an opinion by the D.C. Circuit which considered a Title VII racial discrimination claim involving

18

denial of tenure to a law school professor.  (*Mawakana v. Bd. of Trustees of Univ. of the D.C.* (D.C. Cir. 2019) 926 F.3d 859 (*Mawakana*).)  The professor was unquestionably an employee of the law school, and a denial of tenure is clearly an adverse employment action.  The university asserted Mawakana was denied tenure for deficient scholarship.  A finding of deficient scholarship, of course, would be an academic decision or, put differently, the product of academic judgment.  This mixture is somewhat similar to the situation of medical residents, whose employment may be affected by academic issues.  The *Mawakana* court found, however, that the university was not entitled to special deference in Title VII tenure claims.  As the court explained, the premise of academic deference is that the decision was made in good faith and for a genuinely academic reason, but "a Title VII claim requires a court to evaluate *whether* a university's decision to deny tenure was made in good faith (i.e., for academic reasons rather than for an impermissible reason such as the applicant's race)."  (*Id*. at p. 865.)

By way of background, the court noted that when "Congress passed Title VII in 1964, educational institutions were exempt 'with respect to the employment of individuals to perform work connected with the educational activities of such institutions[s].'  [Citation.]  Eight years later, however, in 'response to the widespread and compelling problem of invidious discrimination in educational institutions,' *Univ. of Pa. v. EEOC* (*Penn*), 493 U.S. 182, 190, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), the Congress amended Title VII and eliminated that exemption.  [Citation.]  The Congress was not persuaded by opponents of the amendment who 'claimed that enforcement of Title VII would weaken institutions of higher education by interfering with

19

decisions to hire and promote faculty members.' *Penn*, 493 U.S. at 190, 110 S.Ct. 577. Ever since the Congress 'abandoned [Title VII's] exemption for educational institutions' in 1972, their academic hiring has been subject to Title VII's restrictions. *Id.*" (*Mawakana, supra*, 926 F.3d at pp. 863–864.) Thirteen years later, the United States Supreme Court decided *Ewing*, which, in the words of the D.C. Circuit, held "that deference to academia is appropriate in certain circumstances." (*Id.* at p. 864.) *Ewing* involved a claim by a student against a university which dismissed him from a combined undergraduate and medical school program.

The D.C. Circuit then noted that five years after the United States Supreme Court discussed academic deference in *Ewing*, the Court decided *Penn*. In *Penn* "the Supreme Court suggested that, notwithstanding *Ewing*, the normal Title VII standard applies to universities. . . . The Court first held that the effect of the 1972 amendment to Title VII . . . 'was to expose tenure determinations to the same enforcement procedures applicable to other employment decisions.' *Id.* at 190, 110 S.Ct. 577. It then rejected the university's attempt to invoke academic freedom as a legitimate ground for refusal to comply with Title VII's requirements. *Id.* at 198, 110 S.Ct. 577 (full enforcement of Title VII does not infringe academic freedom because it does not 'prevent[] the [u]niversity from using any criteria it may wish to use, except those—including race, sex, and national origin—that are proscribed under Title VII')."

In accordance with *Penn*, the *Mawakana* court did not overlook *Ewing;* instead it acknowledged that *Ewing's* concept of academic freedom is appropriate where a court is being asked to review the substance of a genuinely academic decision, not, as in

20

Title VII claims, whether the decision was made in good faith. (*Mawakana*, *supra*, 926 F.3d at pp. 864–865 ["Title VII claim requires a court to evaluate *whether a* university's decision to deny tenure was made in good faith (i.e., for academic reasons rather than for an impermissible reason such as the applicant's race).".)

In declining to apply academic deference to Title VII cases, the *Mawakana* court noted that the burden in tenure decisions, complicated by "specialized multi-factored judgments" involving numerous decisionmakers, compares to any other employment decision which involves complex judgments and numerous decisionmakers. "In other words, the Title VII burden is no more difficult to meet *because* the employer is a university. Although the First Amendment grants a university certain freedoms, the freedom to discriminate is not among them." (*Mawakana*, *supra*, 926 F.3d at pp. 865–866.) We add that judges and juries are as equipped as anyone to decide whether an academic institution acted in good faith or for discriminatory reasons. One does not have to be an academic to ferret out discrimination or retaliation in an academic workspace. We hold that there is no such thing as "academic deference" in a California employment case. Nor should be there. FEHA is a power tool in the effort to root out and stop discrimination. There can be no argument that academics are entitled to special treatment or special exceptions in this regard. Just as we doubt such an argument could have been seriously entertained in *Brown v. Board of Education* (1954) 347 U.S. 483, we doubt it could possibly apply here.

Accordingly, the D.C. Circuit proceeded to analyze the plaintiff's Title VII claim, which was before it on summary judgment, using "the standard three-step burden-shifting

21

framework set forth in [*McDonnell Douglas*].*" (*Mawakana, supra*, 926 F.3d at p. 866.) Under the facts of the case, the court went to the third step, explaining, "the University has proffered a legitimate, nondiscriminatory reason for denying Mawakana tenure. It says he was denied tenure because his scholarship was deficient. Thus, we ask whether, 'viewing the evidence in the light most favorable to [Mawakana] and drawing all reasonable inferences accordingly," [Citations], a reasonable jury could find Mawakana was denied tenure because of his race . . . Specifically, we ask whether a reasonable jury could find that Mawakana's race was a 'motivating factor' in the University's decision to deny him tenure." (*Ibid.*)

The court then concluded that a reasonable jury could find that race was a motivating factor in the University's decision to deny Mawakana tenure. (*Mawakana, supra*, 926 F.3d at p. 866.) The court did not give any presumption of good faith or validity to the decision to deny tenure. It looked at evidence that the University "treated certain criteria differently when assessing the scholarship of black tenure candidates as opposed to white candidates." (*Id.* at p. 867.) The court also considered evidence that the plaintiff's supervisor changed her position about the quality of the plaintiff's work from initially favorable to unfavorable for purposes of the tenure position, suggesting pretext. (*Ibid.*) It also considered evidence that the Dean had supported all white tenure applicants but only about half of the black tenure applicants, and that all white applicants for tenure during the Dean's employment received tenure, but only five of the nine eligible black applicants obtained tenure, and one of those five only received tenure after her Title VII lawsuit

22

survived a motion to dismiss. (*Id*. at p. 868 [two of the nine did not apply at all because the Dean told them they had no chance].)

The *Mawakana* framework is the correct one to apply to FEHA or similar employment based claims involving medical residents. Thus, the trial court erred in instructing the jury that academic deference should be given to respondent's decision. As we discuss below, the trial court's error was prejudicial. For guidance on remand, Dr. Khoiny is only required to prove that her gender or retaliation for her complaints was a substantial motivating factor in her termination. Dr. Khoiny may offer the same evidence as any other FEHA plaintiff to show that respondent's proffered reason was not its true or genuine reason but a pretext for discrimination. The examples of such evidence set forth in *Mawakana* are instructive. To be clear, Dr. Khoiny, like all FEHA plaintiffs, can prevail on her claim by proving that gender or retaliation was a substantial motivating factor for her termination "even though other factors also motivated" the decision. Thus, she need not disprove that her allegedly poor academic performance was a factor, or show that her performance was not poor.[8]

---

[8] Of course, one way of showing pretext would be to show that her academic performance compared favorably to other residents. Another way of showing pretext could be to show that respondents had relied on inaccurate information about her academic performance, by claiming, for example, she achieved a certain score on a national examination when in fact she achieved a different and better score.

E.     *The Challenged Instruction Told the Jury That*
       *Respondent Was Entitled to Academic Deference.*

To assess prejudice from the trial court's erroneous ruling, we first consider whether the instruction told the jury that respondent's decision should be given deference, that is, treated differently than an explanation offered by any ordinary employer. We conclude it does, and so we next examine the record, primarily the evidence, to determine whether a different result could have been reasonably probable in the absence of the erroneous instruction.  We find such a probability.

The doctrine of academic deference is designed to give deference to an academic institution's academic decisions, and to permit only limited review of such decisions.  SI 28 created a presumption that SMMC's decision was valid and it permitted the decision to be rejected only if it is "a substantial departure from accepted academic norms."

The instruction begins by telling the jury that SMMC is not an ordinary employer and that it uses a special kind of judgment in making employment decisions: "Since St. Mary's residency program was *academic* in nature, St. Mary's *academic* judgment . . . ."  The instruction then tells the jury that it must accept the judgment unless the plaintiff proves one of a specified list of reasons: "St Mary's academic judgment should not be *overturned* unless . . . ."  This deference continues in the second paragraph, which tells the jury that it "must *uphold* the decision of St. Mary's Medical Center unless you find . . . a substantial departure from academic norms . . . ."  The effect of these phrases is to tell the jury that SMMC's academic judgment is presumed valid and must be disproved by Dr. Khoiny.

24

Respondent contends that this language does not create a presumption. It is mistaken.

A presumption of correctness is created by the words used in the instruction. A common meaning of overturn is to "invalidate"[9] or "to destroy the power or validity of."[10] Telling the jury that it could not invalidate or destroy the validity of SMMC's decision indicated that the decision is being treated as valid to begin with. Similarly, "uphold" means to "to say that a decision that has already been made . . . is correct."[11] Thus, the choice of words in the instruction indicates that SMMC's decision is to be treated as correct or valid unless Dr. Khoiny proves one or more specific identified facts.

The phrasing also fits the legal definition of a presumption. Presumptions are " 'conclusions that the law requires to be drawn (in the absence of a sufficient contrary showing) when some other fact is proved or otherwise established in the action.' " (*People v. McCall* (2004) 32 Cal.4th 175, 182.) That is precisely what this instruction does, with one minor variation. The trial court actually found the "other fact," that is, that SMMC is an

---

[9] Merriam-Webster Dictionary Online (2022) <https://www.merriam-webster.com/dictionary/ overturn> [as of March 11, 2022], archived at <https://perma.cc/YS3X-T2BM>.

[10] Disctionary.com <https://www.dictionary.com/browse/overturn> [as of March 11, 2022], archived at <https://perma.cc/94YN-TMSA>.

[11] Cambridge Dictionary Online (2022) <https://dictionary.cambridge.org/us/dictionary/english/uphold> [as of March 11, 2022], archived at <https://perma.cc/7AD4-E5ZW>.

25

academic institution. Thus, the instruction told the jury that because SMMC is an academic institution, the jury must conclude that SMMC's judgment or decision is valid unless Dr. Khoiny proved one or more specific identified facts (a contrary showing). Under FEHA, there is no presumption of validity as to the employer's proffered reason.

Respondent contends SI 28 instructed the jury as to when it could "overturn" SMMC's academic judgment and in doing so, it comported with CACI Nos. 2500 and 2505, which required Dr. Khoiny to prove, inter alia, that her gender or discrimination complaints were "a substantial motivating reason" for respondent's adverse employment actions. SI 28 in no way comports with CACI. The instruction on when the jury could "overturn" SMMC's academic judgment required less of respondent and more of Dr. Khoiny than the law does. In the terminology of *Mawakana*, the instruction did not require respondent to prove that its decision was made in good faith and was a genuinely academic one; the jury was instructed that the decision was the product of academic judgment, and further instructed that the decision was presumed valid. The instruction also told the jury that Dr. Khoiny had to prove that SMMC's "academic judgment" was "motivated by retaliation or discrimination unrelated to her academic performance" in order to "overturn" that judgment. That is the point of the academic deference doctrine: "An essential element of all claims such as appellant's, which seek to challenge an academic decision of a private university, is proof that the decision . . . was not based upon any discernible legitimate, rational basis." (*Banks, supra*, 35 Cal.App.4th at p. 1553.)

26

FEHA does not require Dr. Khoiny to disprove or invalidate respondent's stated reasons for termination to prevail on her claims. A plaintiff need only show that gender or retaliation was a substantial motivating reason. Thus, Dr. Khoiny could recover even if her academic performance was poor and that poor performance was a factor in respondent's decision (as long as it was not a substantial motivating factor).[12]

Similarly, respondent misses the mark when it defends the reference to "upholding" SMMC's decision "unless . . . it was a substantial departure from academic norms." SMMC argues the language did not tell the jury to uphold the decision even though it was a pretext or to give deference to a pretextual decision. We find the "upholding" paragraph misstates the law because it expressly told the jury to accept respondent's decision unless Dr. Khoiny showed that respondent's decision was a departure from academic norms. This is simply not plaintiff's burden in proving a claim for employment discrimination or retaliation. Respondent argues that if a decision were discriminatory or retaliatory, it would be "a substantial departure from accepted academic norms" and so the instruction, in effect, correctly told the jury that it should uphold respondent's decision unless it found discrimination or retaliation. Referring to departures from "accepted academic norms" would be, at best, an incredibly indirect and wordy way to tell the jury that it had to uphold the decision unless it found that the decision was discriminatory or retaliatory. We doubt the jury understood it in that sense. The use of the modifier "academic" strongly suggests the instruction

---

[12] The jury was instructed on this general concept with CACI No. 2507, but, as we show, SI 28, the more specific instruction, conflicts with it.

27

is referring to norms which are unique to academia. In any event, respondent's interpretation of the instruction would still require Dr. Khoiny to prove more than FEHA requires: she would have to prove that discrimination or retaliation was a substantial departure from academic norms in that the decisionmaker failed to actually exercise professional judgment.[13]

F. *It Is Reasonably Probable A Jury Would Have Believed Appellant's Evidence If Properly Instructed.*

Merely determining that the trial court gave an erroneous instruction is not sufficient to show prejudicial reversible error. We must also evaluate the record.

"When the sole contention on appeal concerns a jury instruction, we do not view the evidence in a light most favorable to the prevailing party. Rather, to assess the instruction's prejudicial impact, we assume the jury might have believed appellant's evidence and, if properly instructed, might have decided in appellant's favor. [Citation.] 'Accordingly, we state the facts most favorably to the party appealing the instructional error alleged, in accordance with the customary rule of appellate review. [Citation.]' " (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1087.)

---

[13] Respondent's claims on appeal leave us wondering why it fought so hard for an instruction which it now argues did nothing more than repeat or restate the requirements of CACI Nos. 2500, 2505 and 2507 and FEHA's prohibition against discrimination and retaliation. Does respondent contend it received no benefit from SI 28? If, in fact, SI 28 does not tell the jury that respondent's decision to terminate Dr. Khoiny was entitled to academic deference, then why is respondent contending the trial court was correct to find that academic deference applied?

Nonetheless, " '[i]n a civil case an instructional error is prejudicial reversible error only if it is *reasonably probable* the appellant would have received a more favorable result in the absence of the error.' " (*Mayes*, *supra*, 139 Cal.App.4th at pp. 1087–1088.) "[W]hen evaluating the evidence to assess the likelihood that the trial court's instructional error prejudicially affected the verdict, we 'must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' " (*Id.* at p. 1088.)

1. <u>The state of the evidence presented a probability of discrimination, retaliation, and pretext.</u>

The evidence in this case was voluminous and detailed. Dr. Khoiny and respondent presented starkly different views of Dr. Khoiny's performance as a resident. Fundamentally, respondent accused her of patient mismanagement and not being proactive in taking the lead in treatment decisions.

Residents rotate through internal medicine subspecialties, including Wards (for in-patient care), the ICU, and cardiology, oncology, nephrology and pulmonology. They are evaluated on six "core competencies" identified by ACGME and the American Board of Internal Medicine. Evaluations are submitted by faculty, anonymous peers, patients, nurses, other professional staff, and themselves. A Clinical Competency Committee (CCC) at SMMC evaluates and counsels residents. Ratings are unsatisfactory, marginal, satisfactory, and superior. "Marginal" means "meets some expectations but occasionally falls short." A resident who receives two consecutive cumulative ratings of

29

marginal does not receive full credit for the second year of the three-year residency.

We cannot agree with respondent that there was no evidence of discrimination or that the evidence was overwhelming that Dr. Khoiny's patient care was marginal. Two experts testified her patient care was not marginal. Residency expert Dr. Christopher Schaeffer, the former training program director for all medical residents at SUNY-Buffalo, which had one of the largest internal medicine residency programs in the country, opined that "inefficiency" was often seen in first year residents, Dr. Khoiny's clinical evaluation scores ("one of the best tools to evaluate residents") were satisfactory and superior in various categories, her national exam scores in her second year of residency strongly predicted she would pass the boards, and her response to deficient patient care allegations showed medical knowledge and appropriate decision making.

Critical care expert Dr. Seth Rivera, after reviewing the actual patient records in the cases where Dr. Khoiny was accused of providing inadequate care, opined that Dr. Khoiny's patient care was satisfactory and not inadequate or substandard.

Two accusations of patient mismanagement featured prominently in Dr. Khoiny's dismissal and showed different criteria being applied to male and female residents. In the first, Dr. Khoiny was told to intubate an ICU patient, a procedure for which she was not yet certified. A male resident, certified to do the procedure, offered to supervise her. However, when they entered the patient's room, the male resident decided the intubation would be too difficult. He left the room to contact another doctor for assistance. In the meantime, Dr. Khoiny called Dr. Maged Tanios, the supervising ICU physician, for

30

assistance. When Dr. Tanios arrived, he reprimanded her for not doing the procedure. He did not, however, in any way, criticize the male resident, who had made the actual decision not to intubate. At trial, Dr. Tanios testified Dr. Khoiny had abandoned the patient, even though she was present in the room when he arrived (the other resident was not) and had been the one to contact him for help. His testimony was shown to be false as Dr. Khoiny's rendition of events was corroborated by other staff members. Nonetheless, Dr. Khoiny was later replaced in the ICU rotation by the same male resident who had not performed the procedure either. Although she had been told before the intubation incident that she would be advanced to the third year of residency, after the incident she was rated marginal and then terminated.

In the second patient mismanagement allegation, Dr. Khoiny was disciplined for "potentially" ordering an incorrect sodium treatment for a patient. When advised that she would be disciplined, Dr. Khoiny pointed out that Dr. Winarko had actually mismanaged a patient's sodium levels but not been disciplined for it; Dr. Zhang had not been disciplined for the ICU intubation incident; and Dr. Mehdizadeh had actually misdiagnosed a patient a few days earlier. The response was that these residents, who were male, were being disciplined "[in] private."

At least seven other female residents had complained that Dr. Maghed Tanios, the ICU supervising physician, belittled and intimated them and held them to a harsher standard than male residents. They complained he also forced residents to work excessive hours in the ICU, did not adequately supervise the residents, and did not respond to pages, all in violation of

31

ACGME guidelines and all encompassed in Dr. Khoiny's own complaints she voiced about the residency program. Despite being on notice as to the complaints about Dr. Tanios, no changes were made.

In addition to the seeming use of different criteria for male and female residents, evaluators in the residency program appeared to change oral positive evaluations of Dr. Khoiny to negative after her complaints about the work schedule or, at the very least, ignored the positive and relied heavily on the negative when they decided to terminate her. While a number of attending physicians in the program rated her satisfactory or higher; at least as many provided no evaluation at all. The most negative evaluations were from anonymous peers, several of whom were shown to have reasons to feel hostility toward her because she complained about violations of ACGME guidelines. Indeed Dr. Khoiny had been told she was doing an excellent job in her Wards rotation; thereafter one peer evaluator wrote a negative evaluation for the same rotation and filed it only after Dr. Khoiny had complained about staffing problems.

Another male evaluator told Dr. Khoiny she was "thorough" in her evaluations of patients upon admission, but she should, in effect, take an incomplete history of the patient until she had more time later to fill in the "gaps" when doing so would not violate ACGME duty hour limitations. This evaluator then labeled her thoroughness as inefficiency and grounds for dismissal. This negative characterization occurred after the evaluator became angry when Dr. Khoiny complained about ACGME-violative working conditions in the evaluator's rotation.

Dr. Khoiny further testified that when she began her rotation in the ICU, Dr. Tanios openly complimented male residents for their confidence even when they were wrong about the facts, but was much more harsh and critical of female residents.  A few days into the rotation, Dr. Khoiny received a call that she should finish her shift but she was going to be replaced in the ICU rotation with another resident, a male.  She was told the reason for the change could not be disclosed.

Neither can we agree with respondent that there was no evidence of retaliation or pretext.  During Dr. Khoiny's first year of residency, she complained that SMMC was violating ACGME guidelines for number of required work hours.  These complaints were reported to ACGME.  She asked on more than one occasion to have her back-to-back shifts modified to protect patient safety.  Her supervisors declined to intervene.  She pointed out that she had not received ACGME-required written evaluations at the end of each rotation.  When she did receive an evaluation by her supervising physician, he rated her satisfactory or better in 10 categories, including the six core competencies identified by ACGME.  However, she continued to be scheduled for back-to-back rotations by the chief resident and received negative peer evaluations shortly after she complained about the work schedule.

Dr. Khoiny also protested that the ICU did not have 24-hour supervision of residents, and Dr. Tanios and another attending physician had not been answering their pages 50 percent of the time.  Her objections were met with anger.

In at least one instance, Dr. Khoiny testified a resident gave her positive oral feedback before her complaint and negative written feedback afterward.  It is clear these negative peer

evaluations were part of her marginal ratings on her yearly evaluations. In another instance, she received satisfactory or better ratings in 10 categories, but was told she needed to prioritize "patients' care over [her] own needs," possibly a reference to her complaints about the excessive and ACGME-violating working hours. As for pretext, among other things, Dr. Khoiny argued that the outcome of the CCC meeting was predetermined, as arguably shown by the CCC's refusal to obtain and review the actual patient medical records, and its rendering of a decision in less than 30 minutes.

Statistics showed that less than 1 percent of residents are terminated nationwide, making termination a rare event. Although the SMMC residency program was evenly split by gender, all discretionary terminations appear to have been 100 percent women. Even if the evidence is deemed relatively balanced and the jury "could reasonably have gone either way . . . it is quite probable that the jury utilized the tie-breaking tool necessary to our system of factfinding: When in doubt, find against the party with the burden of proof." (*Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 394.) That party would be Dr. Khoiny under the erroneous SI 28 instruction.

2.    Other jury instructions did not offset the effect of SI 28.

Other more general instructions in the case did not offset the error as they did not specifically address the academic deference defense. SI 28, as the conflicting, more specific instruction, effectively trumped the CACI form instructions.

34

### 3. Counsel argued the concept of academic deference.

Respondent correctly points out that it never used the term "academic deference" in closing argument and did not refer to SI 28. Respondent's counsel began closing argument by focusing on Dr. Khoiny's academic performance, claiming her counsel "never argued her academic performance. Her academic performance was actually abysmal." Counsel returned to academic performance near the end of argument, stating: "So the issue about academic performance, the first question on the verdict form, did they make the decision to terminate her arbitrarily and capriciously without regard to academic performance or in bad faith without regard to academic performance, of course they did not." Respondent's counsel also told the jury: "This was a well-thought out decision. So if you answer the first question, was her termination arbitrary and capricious, not based on academic performance, you sign it 'No,' you sign and return the verdict form. You are done." Intentionally or not, this was a summary of the academic deference rule that was even more deferential and limiting than the version of the rule in SI 28. Counsel ended by urging the jury to "look at her academic performance."

### 4. The jury clearly relied on SI 28

Although this factor typically asks if there is any indication from the jury itself that it was "misled" by the instruction, we think the better phrasing in this case is whether the jury's behavior indicated it relied on SI 28. There is some evidence of this.

A question by the jury indicated that they were confused by the first question on the special verdict, entitled "Academic Deference."  The jury asked the court: "In relation to Question 1 of the special verdict, Academic Deference, what are the definition meanings below: [¶] One:  arbitrary and capricious; [¶] Two, bad faith; [¶] Three:  ill will?"  At this point, the jury did not have copies of the jury instructions.  The court's response was to give them a written copy of the jury instruction packet and direct its attention to SI 28.  The court's response focused the jury on SI 28, indicated to the jury that SI 28, which was untitled, involved "academic deference," and suggested that the jury rely on SI 28 to answer the first question on the verdict form.  The jury asked no further questions on this topic, suggesting that they did rely on SI 28 to answer the first (and determinative) question on the special verdict form.

Viewing the evidence in the light most favorable to Dr. Khoiny, and considering the analytical factors as a whole, it is reasonably probable that Dr. Khoiny would have achieved a more favorable outcome if the jury had not been erroneously instructed on the concept of academic deference.

II.    The Trial Court Did Not Abuse Its Discretion in Excluding "Me Too" Evidence.

Dr. Khoiny contends the trial court abused its discretion in excluding a text sent by Dr. Leah Damiani and testimony from her that Dr. Tanios did not shake hands with women.

The text stated in pertinent part: "I really think women and minorities do not have a fair shake here and I am really tired of it.  It is too much."  If offered to show that respondent was on notice of possible gender discrimination, it was very vague and also cumulative.  If offered for the truth of the matter asserted, it

36

was hearsay.  According to Dr. Khoiny, a more specific email from Dr. Damiani to Drs. Chester Choi and Andrew Burg was admitted.

We agree with the trial court that the reason Dr. Tanios did not shake hands with women was speculative.  There is no context for this behavior.  Perhaps more details would make the practice clearer, but Dr. Khoiny has not provided such details.

III.  Dr. Khoiny Did Not Forfeit Her Objections, Much Less Commit Invited Error.

A.  *Dr. Khoiny Objected to the Instruction on Academic Deference.*

Dr. Khoiny contends instruction SI 28 is erroneous as given, which does not require an objection.  "It is well settled that there is no waiver for failure to object.  Code of Civil Procedure section 647 provides, in pertinent part, that the trial court's 'giving an instruction, refusing to give an instruction, or modifying an instruction requested . . . [are] deemed to have been excepted to.'  [Citation.]  As we have stated, 'when a trial court gives a jury instruction which is prejudicially *erroneous as given,* i.e., which is an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal.  [Citation.]'  [Citation.]" (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 705–706; *Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 530 ["in a civil case, a party is deemed to have objected to an erroneous jury instruction; there is no waiver for failure to object."].)

37

Assuming an objection was required, Dr. Khoiny clearly objected to SI 28 as given at the first trial, which ended in a mistrial. The court asked Dr. Khoiny's counsel if she was in agreement with an instruction on academic deference, and counsel replied: "We are not." Her counsel pointed out that the issue of academic deference had been argued in connection with summary judgment. Counsel repeated Dr. Khoiny's contention that academic deference "doesn't apply where there's any kind of discrimination." Co-counsel added that the cases cited by defense counsel were "student cases. This is an employment [case]." The trial court decided to give the instruction.

About a month before the second trial of this matter, the trial court observed: "I know what this case looks like. I've heard the witnesses. My rulings are not going to change unless somebody has something new that I'm not aware of." The court specifically stated: "I don't need more jury instructions. I don't need a verdict form." The court indicated it did not want any new filings as "I've heard every issue that possibly exists in this case." Given the trial court's remarks, we certainly cannot fault Dr. Khoiny's counsel if they followed the court's directives and did not object to the instructions or special verdict form during the second trial.

Nevertheless, the record shows Dr. Khoiny's counsel did, in fact, register a continuing objection to the instruction and the special verdict form. Near the end of the second trial, the trial court stated: "We will go through the three instructions that are objected to by the [plaintiff]." The court and the parties then discussed CACI No. 2430, Special Instruction 29 and SI 28.

When the discussion turned to SI 28, the trial court said: "I thought you had an objection to the second paragraph." Dr.

38

Khoiny's counsel replied: "Well, yes, I—Defense counsel interjected: "The first paragraph, he has an objection to." Dr. Khoiny's counsel agreed, but clarified that he did not object to the third paragraph, which added a definition of "arbitrary and capricious." He added that he also had no objection to adding the phrase "Based on the court's finding" to the first paragraph "if the court is making that finding." The trial court and defense counsel could have had no doubt that Dr. Khoiny was objecting to the first two paragraphs of SI 28 which involve academic deference.

In discussing the special verdict form, defense counsel argued that the first question on the verdict form should ask if SMMC acted in a manner that was "arbitrary and capricious or motivated by ill will, unrelated to academic performance." Counsel pointed out that if the jury answered no to the question, "it's over." Only if they answered yes would they reach the questions about gender discrimination or retaliation. (which defense counsel viewed as simply forms of "bad faith" or "ill will.") Dr. Khoiny's counsel objected that academic deference is "basically in the nature of an affirmative defense" and the verdict should start with the questions about gender discrimination and retaliation, not with questions focused on an affirmative defense.

Dr. Khoiny preserved her objections.

B.     *Dr. Khoiny Did Not Invite Error.*

Respondent contends Dr. Khoiny "partially drafted" SI 28 and explicitly approved the special verdict form and so the doctrine of invited error applies. The doctrine of invited error requires some form of active advocacy for the decision now claimed as error on appeal. There was no such advocacy here; the doctrine does not apply.

An error is invited when a party purposefully induces the commission of error.  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)  The doctrine of invited error bars review on appeal based on the principle of estoppel.  (*Ibid*.)  The doctrine is intended to prevent a party from leading a trial court to make a particular ruling, and then profiting from the ruling in the appellate court.  (*Ibid*.)  Accordingly, the doctrine of invited error contemplates " 'affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party.' " (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1210.)

The doctrine has not been extended to situations wherein a party may be deemed to have induced the commission of error, but did not in fact mislead the trial court in any way—as where a party " ' " 'endeavor[s] to make the best of a bad situation for which [it] was not responsible.' " ' " (*Norgart v. Upjohn Co.*, *supra*, 21 Cal.4th at p. 403.)

Dr. Khoiny's draft of SI 28 involved the insertion of the words "or motivated by retaliation or discriminatory reasons" into the instruction on academic deference respondent proposed.[14]  As Dr. Khoiny reminded the trial court, the court had already agreed during the previous trial that the terms "ill will or bad faith" as used in the definition of academic deference could include retaliatory and discriminatory reasons.  The trial court had already ruled in connection with the current trial that academic

---

[14]    The first paragraph proposed by respondents read: "Since St. Mary's residency program was academic in nature, St. Mary's academic judgment should not be overturned unless it is found to have been arbitrary and capricious, not based on academic criteria, or motivated by bad faith or ill will unrelated to her academic performance."

deference applied, and thus counsel was making the best of a bad situation by trying to indicate to the jury that discrimination and retaliation were reasons to "overturn" respondent's academic judgment. As we discuss in more detail below, inserting those two words did not make the instruction correct. Dr. Khoiny certainly did not argue to the court that the instruction was correct with these modifications, or perhaps more significantly in terms of invited error, does not now argue that inclusion of the words she suggested made the instruction incorrect.

The special verdict form was almost entirely drafted by respondent. Dr. Khoiny's counsel initially objected to a special verdict form where the first question addressed the issue of academic deference; counsel asserted academic deference was an affirmative defense more properly addressed after the issues of discrimination and retaliation. Respondent correctly points out Dr. Khoiny shifted positions the next day. Her counsel stated: "[W]e are fine with having that as the first question." At most, Dr. Khoiny agreed to the verdict form proposed by respondent. She in no way advocated for it, as is required to properly apply the doctrine of invited error. There was no invited error.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial.  Costs are awarded to appellant.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:


GRIMES, Acting P. J.


WILEY, J.